Hugh J. WADE, Secretary of State,
State of Alaska, Appellant,

v.

James NOLAN et al., Appellees.

No. 731.

Supreme Court of Alaska.

May 20, 1966.

Warren C. Colver, Atty. Gen., Michael M. Holmes, Deputy Atty. Gen., Theodore E. Fleischer, Asst. Atty. Gen., Juneau, for appellant.

Avrum M. Gross, Faulkner, Banfield, Boochever & Doogan, Juneau, for appellees.

Before NESBETT C. J., and DIMOND and RABINOWITZ, JJ.

NESBETT, Chief Justice.

The principal question presented by this appeal is whether the Governor of Alaska was authorized by the Alaska Constitution to reapportion the Alaska Senate on an interim basis after United States Supreme Court decisions had declared invalid "frozen" area apportionment plans such as that provided by Section 2, Article XIV of the Alaska Constitution.

In the historic decision of Baker v. Carr,[1] decided by the Supreme Court of the United States on March 26, 1962 it was held that the apportionment of a state legislature was subject to review by the courts for a violation of the equal protection clause of the Fourteenth Amendment[2] for effecting a gross disproportion of representation to voting population.

In Reynolds v. Sims,[3] decided two years later on June 15, 1964, the United States Supreme Court held that the equal protection clause requires that the seats in both houses of a bicameral state legislature be apportioned on a population basis. In accordance with the foregoing, the court held that the three reapportionment plans for Alabama which were being considered were unconstitutional and that upon the legislature's failure to act effectively to revise the invalid plans, the United States District Court acted properly in ordering its own temporary reapportionment plan into effect so that a reapportioned legislature could act effectively to adopt a permanent valid plan.

The decision in Reynolds v. Sims immediately posed the question of whether the Alaska State Senate was constitutionally apportioned on a population basis since Section 2, Article VI of the Alaska Constitution provides that members of the Senate shall be elected by the voters of the senate districts as set forth in Section 2 of Article XIV,[4] which latter section establishes senate districts based on area, defined by combining various house districts established by Section 1 of Article XIV, and prescribes the number of senators to be elected from each senate district.[5] Further, Section 7 of Article VI provides that the senate districts can be modified to reflect changes in house election districts, but that a senate district shall nevertheless retain its total number of senators and its approximate perimeter.[6]

Section 3 of Article VI provides that the Governor shall reapportion the House of Representatives immediately following each decennial United States census upon the basis of civilian population in each house election district as reported by the census.[7]

1. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

2. Sec. 1, Art. XIV of the United States Constitution in pertinent part states:
   No State shall make or enforce any law which * * *; nor deny to any person within its jurisdiction the equal protection of the laws.

3. 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

4. Sec. 2, Art. VI states:
   *Section 2. Senate Districts.* Members of the senate shall be elected by the qualified voters of the respective senate districts. Senate districts shall be as set forth in Section 2 of Article XIV, subject to changes authorized in this article.

5. See note 5 on page 691.

6. Sec. 7, Art. VI states:
   *Section 7. Modification of Senate Districts.* The senate districts, described in Section 2 of Article XIV, may be modified to reflect changes in election districts. A district, although modified, shall retain its total number of senators and its approximate perimeter.

7. Sec. 3, Art. VI states:
   *Section 3. Reapportionment of House.* The governor shall reapportion the house of representatives immediately following the official reporting of each decennial census of the United States. Reapportionment shall be based upon civilian population within each election district as reported by the census.

Section 4 of Article VI provides basically that reapportionment should be by the method of equal proportions.[8]

Sections 5 and 6, Article VI provide that the Governor, in carrying out his reapportionment duties, can change the size and area of house election districts within prescribed limits, and prescribes other criteria for reapportioning to maintain representation by equal proportions.

Section 8, Article VI requires the Governor to appoint a five member, non-political, area representative, Reapportionment Board to act in an advisory capacity to him.[9]

Sections 9 and 10, Article VI provides. some basic organization and procedure for the Board and require it, acting on its own. initiative, to submit to the Governor a plan. for redistricting and reapportionment with-

5. Sec. 2, Art. XIV states:

*Section 2. Senate Districts.* Members of the senate shall be elected from the senate districts and in the number shown below:

| Name of District | Composed of Election Districts | Number of Senators |
|---|---|---|
| A. Southeastern | 1, 2, 3, 4, 5, and 6 | 2 |
| B. Ketchikan-Prince of Wales | 1 and 2 | 1 |
| C. Wrangell-Petersburg-Sitka | 3 and 4 | 1 |
| D. Juneau-Yakutat | 5 and 6 | 1 |
| E. Southcentral | 7, 8, 9, 10, 11 12, 13, and 14 | 2 |
| F. Cordova-Valdez | 7 and 8 | 1 |
| G. Anchorage-Palmer | 9 and 10 | 1 |
| H. Seward-Kenai | 11 and 12 | 1 |
| I. Kodiak-Aleutians | 13 and 14 | 1 |
| J. Central | 15, 16, 17, 18, 19, and 20 | 2 |
| K. Bristol Bay-Bethel | 15 and 16 | 1 |
| L. Yukon-Kuskokwim | 17 and 18 | 1 |
| M. Fairbanks-Fort Yukon | 19 and 20 | 1 |
| N. Northwestern | 21, 22, 23, and 24 | 2 |
| O. Barrow-Kobuk | 21 and 22 | 1 |
| P. Nome-Wade Hampton | 23 and 24 | 1 |

Note: The Governor's Reapportionment Proclamation of December 7, 1961, reapportioning the House, caused minor changes to be made in the allocation of election districts from that shown above. See AS Vol. 1, pp. 268-269.

———◆———

8. Sec. 4, Art. VI states:
    *Section 4. Method.* Reapportionment shall be by the method of equal proportions, except that each election district having the major fraction of the quotient obtained by dividing total civilian population by forty shall have one representative.

9. Sec. 8, Art. VI states:
    *Section 8. Reapportionment Board.* The governor shall appoint a reappor-

tionment board to act in an advisory capacity to him. It shall consist of five members, none of whom may be public employees or officials. At least one member each shall be appointed from the Southeastern, Southcentral, Central,. and Northwestern Senate Districts. Appointments shall be made without regard to political affiliation. Board: members shall be compensated.

in ninety days following each decennial census. Within ninety days after receipt of the plan the Governor is required to issue a proclamation of reapportionment and redistricting, explaining his reasons for changing any part of the Board's plan.[10]

Section 11, Article VI permits any qualified voter to apply to the superior court to compel the Governor to perform his reapportionment duties or to correct any error in reapportionment or redistricting.

It is clear from the foregoing provisions that the Governor, with the assistance of the Reapportionment Board, must reapportion representation in the House of Representatives on a method of equal proportions, every ten years; that he must explain any deviation from the reapportionment plan submitted to him by the Board and that any qualified voter can invoke the power of the courts to compel him to reapportion or to correct any error made by him in reapportioning or redistricting.

No specific provision is made for reapportioning the Senate. In carrying out his reapportionment of the House, the Governor is empowered to modify senate districts to reflect changes made in house election districts, but each senate district must retain its total number of senators and its approximate perimeters.[11] It is clear therefore, that representation in the Senate is determined by area rather than population, with no specific provision made for changing this plan.

Approximately two months after Reynolds v. Sims and on August 17, 1964, the Attorney General of Alaska, in response to a request from the Governor, issued an opinion advising that in his opinion the Governor had authority to reapportion the Alaska Senate. On August 18, 1964 the Governor issued a "Proclamation Concerning Reapportionment and Redistricting" which called the advisory board on reapportionment established by the Alaska Constitution into session. After holding publicized hearings throughout the state, the Reapportionment Board submitted a plan to the Governor on December 10, 1964. On March 6, 1965 the Governor issued a second proclamation which reconvened the Reapportionment Board for another publicized ninety days of hearings and study for the purpose of reconsidering its Senate reapportionment plan in the light of recent United States Supreme Court decisions. On June 8, 1965 the Reapportionment Board submitted a second plan to the Governor, who, on September 3, 1965, issued the Proclamation of Reapportionment and Redistricting which was intended to be applicable to the 1966 primary and general elections and which is the subject of this suit.

On the 21st day of February 1966, appellees applied to the Superior Court for the First Judicial District in Juneau for a permanent injunction to prohibit the appellant Secretary of State from conducting any election pursuant to the Governor's Proclamation of Reapportionment and Redistricting on the ground that he did not have the authority to declare the apportionment of the Alaska Senate in conflict with the Constitution of the United States and to direct the appellant to ignore the existing Alaska Constitution Senate ap-

10. Sec. 9, Art. VI states:
    *Section 9. Organization.* The board shall elect one of its members chairman and may employ temporary assistants. Concurrence of three members, is required for a ruling or determination, but a lesser number may conduct hearings or otherwise act for the board.
    Sec. 10, Art. VI states:
    *Section 10. Reapportionment Plan and Proclamation.* Within ninety days following the official reporting of each decennial census, the board shall submit to the governor a plan for reapportionment and redistricting as provided in this article. Within ninety days after receipt of the plan, the governor shall issue a proclamation of reapportionment and redistricting. An accompanying statement shall explain any change from the plan of the board. The reapportionment and redistricting shall be effective for the election of members of the legislature until after the official reporting of the next decennial census.

11. Supra, note 6.

portionment formula in holding statewide elections. Appellees alleged that if the appellant Secretary of State is permitted to conduct the 1966 primary and general elections for the Alaska Senate, as directed by the Governor's proclamation, the election will be invalid and deprive them of their rights of suffrage under Article V of the Alaska Constitution.

Both sides eventually moved for summary judgment and on April 12, 1966 the superior court entered a judgment decreeing that Section 2, Article XIV of the Alaska Constitution, which establishes the present apportionment of the Alaska Senate, is in conflict with and invalid under the Fourteenth Amendment to the United States Constitution; that the Governor's Proclamation of Reapportionment and Redistricting of September 3, 1965 was null and void and that appellant Secretary of State could not follow the terms of the proclamation in the conduct of the 1966 primary and general elections. The superior court retained jurisdiction, providing that if a valid constitutional amendment modifying the apportionment of the Alaska Senate was not adopted by December 1, 1967 the court would issue the necessary orders to insure that the 1968 primary and general elections would be held under an apportionment plan consistent with the Fourteenth Amendment to the United States Constitution.

Appellees argue that the Alaska Constitution "limits" the Governor's reapportionment authority to the House and "prohibits" him from reapportioning the Senate. Appellees mean to argue, no doubt, that the claimed limitation and prohibition result from the fact that the constitution only explicitly grants the Governor the power to reapportion the House and makes no provision whatever for reapportioning the Senate under any circumstance or contingency. They also argue that the present necessity to reapportion does not affect his authority to do so and that while the Constitutional Convention did not foresee present developments, it nevertheless clearly intended that any reapportionment of the Senate be by constitutional amendment.

Appellant argues that Article VI of the Alaska Constitution makes reapportionment an executive function; that those provisions of the constitution which "freeze" the Alaska Senate and exempt it from periodic reapportionment have been invalidated by the United States Supreme Court's reapportionment decisions and that the task of reapportioning Alaska's Senate thus fell to the Governor as a part of his reapportionment function. Appellant points out that in states where reapportionment is a legislative function, the courts have permitted and required legislatures to enact laws reapportioning "frozen" houses, even though the legislature may have no specific authority under the state constitution to reapportion a "frozen" house. In Alaska, where the constitution makes reapportionment an executive function, appellant argues the Governor has authority to reapportion a "frozen" house.

Appellees' argument that the Governor's reapportionment authority was limited to the House and that the constitution "prohibits" him from reapportioning the Senate are not logical conclusions to be drawn from that document. Neither conclusion can be logically inferred from the written provisions. The fact that the constitution places upon the Governor the affirmative duty to reapportion the House at stated periods while in the same article it freezes the Senate and makes no provision for the Governor or any other official or branch to reapportion it, is no basis for the conclusion that the Governor was prohibited from reapportioning the Senate, or, that the Constitutional Convention "clearly opposed" a reapportionment system for the Senate similar to the one they provided for the House, as appellees argue.

The fact is that the Convention drafted the constitution some seven years before Baker v. Carr was decided. At the time of its drafting and providing for a "frozen" Senate, that is, a body whose representation was permanently based on area rather

than according to population, the Convention was following the pattern established by the United States Constitution and later followed by many of the states of the Union with respect to one or the other of their legislative bodies. The Convention obviously did not want the Senate apportioned on a population basis; it had practical reasons for not doing so and had no reason to anticipate that it would ever be necessary to reapportion the Senate on a population or on any other basis, hence no specific provision was made for its reapportionment.

The question which is squarely presented is whether the acts of the Governor and his advisory Reapportionment Board in reapportioning the Senate were authorized by the Alaska Constitution.

Before attempting to discuss this question it is well to explain the origin of a unique feature of the reapportionment provisions of the Alaska Constitution. Whereas, traditionally, reapportionment had been made the responsibility of state legislatures, the Alaska Constitutional Convention purposely avoided placing any authority or responsibility for reapportionment in the legislature. The Convention was aware of the notorious and frequent failure or downright refusal of state legislatures to comply with their constitutional or statutory duty to reapportion. The Alaska Convention's reason for placing reapportionment responsibility in the Governor was well stated by its Chairman of the Committee on Suffrage, Elections and Apportionment, John S. Hellenthal, as follows:

HELLENTHAL: * * * Now on the method of the composition of the reapportionment and redistricting board, because redistricting, as we have explained would be necessary, the Committee recommends that the stress be placed on the executive in determining which of these election districts and where redistricting shall take place, or reapportionment, and it recommends the creation of a five-man advisory board to advise the governor with regard to the redistricting and reapportionment. * * * The reason that this plan was adopted is that the students and writers seem generally in accord that reapportionment, for some reason or other, I don't know why, but it has been neglected where it has been left to the legislators. Maybe it's that human element I spoke of earlier, but anyway the experience of the nation shows that the thing is delayed—procrastination; that in the State of Washington they waited for years and years and years, and finally, only by resorting to the courts and the initiative were they able to reapportion Washington. It was costly, the people suffered. And based on that experience and the recommendations, and it's almost universal of the advisors, and by advisors I don't mean the men that were here necessarily—but the writers throughout the country, the executive board was chosen, an advisory board. (Minutes of the Alaska Constitutional Convention, January 11, 1956, at 1839).

* * * * * *

Now there are other plans. There is no end of variations of plans that can be devised for the reapportionment with the mandamus feature, and you could have variance where a board can be picked—three from the legislature, three nominated by the judicial council, if you want, three of them nominated by some other group of civilians, some appointed by the governor, and get a good cross-section, and they could have the authority themselves to make the redistricting and reapportionment. There is no end to it, but the best thought seemed to indicate that the people would be best helped if it [reapportionment] were an executive function. * * * But it is the inaction of the legislature, as testified to by the universal history of the 48 states, that we're trying to overcome. [Id. at 1859.]

HELLENTHAL: It was felt that it [reapportionment] was a proper executive

function as contrasted to the legislative. * * * [Id. at 1863.]

In its "Report to the People of Alaska" issued in February of 1956 the Constitutional Convention stated:

Representation [in the legislature] will be kept up to date every ten years by an automatic reapportionment carried out by the governor on the advice of a board representing each of the four major districts and subject to review by the courts. Thus, the constitution guards against what has become a great evil in many states: a legislature that becomes more and more unrepresentative and loses public confidence because it refuses to reapportion itself. Alaska Legislative Council, Legislative Apportionment in Alaska, 1912–1961, p. 4 (1962).

A reading of the Convention minutes in relation to the reapportionment provisions makes it abundantly clear that it was the specific intent of the Convention to grant no authority to and to place no responsibility in the legislature with respect to reapportionment. In a clear and clean-cut departure from tradition, all of the authority and responsibility for reapportionment granted or assigned was placed in the Governor, assisted by a Reapportionment Board, including the authority to make minor changes in Senate districts. In an effort to make the reapportionment provisions as nearly self executing as possible, the Convention provided that the Reapportionment Board should automatically commence to function after the decennial census, without any direction from the Governor; that it must submit its plan within ninety days and that the Governor must proclaim a plan within ninety days of receipt from the Board, explaining any deviation from the Board's plan. Any qualified voter was empowered to resort to the courts to force the Governor to perform his reapportionment duties or to correct any error in redistricting or reapportionment.

Baker v. Carr and Reynolds v. Sims resulted in court declarations in many states that one or both of the legislative bodies was malapportioned. In almost every instance the state constitution had made no provision for reapportioning the "frozen" body on an interim basis until the constitution could be amended. Because of the wide variations in factual situations, most of the court decisions dealing with the question of where the authority lay to reapportion a frozen legislative body on an interim basis are not of great assistance.

It is significant, however, that in some states where reapportionment was a legislative responsibility, the courts have approved reapportionment by those state legislatures on an interim basis even though the respective state constitutions gave no specific authority to reapportion the particular frozen legislative body. Illustrative is Buckley v. Hoff [12] decided by the United States District Court in Vermont. In a previous decision, that court had declared both the House and the Senate malapportioned. The constitution required the legislature to reapportion the Senate after each United States census, but the House was frozen to provide one representative for each inhabited town, forever. The General Assembly, consisting of the members of the Senate and House, was only empowered by the constitution to regulate the mode of filling vacancies in House seats. Without any specific constitutional authority, the General Assembly provided reapportionment plans for the Senate and the House which were approved by the court. The authority of the General Assembly to reapportion was not questioned.[13]

---

12. 243 F.Supp. 873 (D.Vt.1964).

13. See: Robert B. McKay, Reapportionment: The Law and Politics of Equal Representation where reapportionment of "frozen" legislative bodies by the legislatures of New Jersey, Connecticut and North Dakota, was accomplished even though the constitutions gave no such specific authority. Pages 295–297, 374–375 and 394–396.

In some states where the constitutions placed reapportionment authority and responsibility in boards or commissions, the courts have recognized the authority of a board or commission to reapportion a "frozen" legislative body on an interim basis, although not specifically granted such power by the constitution.

A Board of Apportionment consisting of the Governor, Attorney General and Secretary of State was given authority by the Arkansas Constitution to reapportion the House and the Senate. The constitution was amended to "freeze" the Senate and remove the Board's power to reapportion it. This constitutional amendment was held invalid by a United States District Court, for having created a malapportioned Senate. The Supreme Court of Arkansas then, in Faubus v. Kinney,[14] held as a matter of state law that the Board of Apportionment was the proper authority to reapportion the Senate, even though it no longer had specific written constitutional authority to do so. The court held that invalidation of the unconstitutional amendment brought the original provision into force. Also, that the intent of the people, expressed in the constitution, that the Board of Apportionment accomplish reapportionment, made the Board the proper authority to undertake interim reapportionment.

In Michigan a constitutionally created Commission on Legislative Apportionment was given authority to reapportion. In In re Apportionment of Michigan Legislature[15] the court, in a decision in which most of the justices participated, seems to have held that the Commission had authority to reapportion, apparently to the exclusion of the legislature.[16]

Appellees argue that reapportionment is a lawmaking function in which the Governor's only part is to recommend laws which he thinks wise and to veto laws he thinks bad, citing Youngstown Sheet & Tube Co. et al. v. Sawyer.[17] This argument and the authority cited do not fit the facts of the case before us. In the first place, there is no substance to the conclusion that reapportionment is exclusively a lawmaking function. Many states now make it the exclusive responsibility of boards or commissions. Reapportionment under the Alaska Constitution, for example, might more properly be defined to be the determination of a plan for the application of a representation formula, which plan once established and proclaimed, becomes law by the operation of our constitution. For example: Sec. 4, Art. VI states that "Reapportionment shall be by the method of equal proportions * * *". This establishes the formula. Sec. 3, Art. VI states "The Governor shall reapportion * * *", definitely placing in the executive the full authority and responsibility. Sec. 10, Art. VI provides that after receipt of the "plan" from the Reapportionment Board, the Governor shall issue his proclamation which "* * * shall be effective for the election of members of the legislature * * *".

Thus, it is apparent that the Governor and the Reapportionment Board are merely delegated the duty of determining a plan for application of the constitutional

---

14. 239 Ark. 443, 389 S.W.2d 887, 892 (1965).

15. 376 Mich. 410, 137 N.W.2d 495, 507, 512 (1965).

16. Note the remarks of Justice Black at 137 N.W.2d at 510:
   * * * I do not believe that a voting majority of the electors would have voted for the proposed constitution had it not included section 6 or some separate-from-the-legislature counterpart thereof. Surely my Brother forgets that the people of Michigan learned, over a long period of years, one thing the hard way, that is, they could not trust any legislature to district and apportion itself according to any validly imposed constitutional principle or plan which might collide with self-perpetuation in office.

17. 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

formula for apportionment. Once a valid plan has been established and proclaimed it becomes law, or "effective" by the force of the constitution. Even if it can be argued that indirectly this is lawmaking, it is nevertheless the unquestioned, unequivocal intent of the constitution that the function be performed only by the Governor with the assistance of the Reapportionment Board.

*Youngstown Sheet & Tube,* cited by appellees, is not in point. There the President had directed the Secretary of Commerce to seize and operate most of the nation's steel mills because of a labor dispute, in order to avoid a national catastrophe and in the interest of national defense. There was no statutory authority and the Supreme Court held there was no constitutional authority to seize private property under the circumstances, even though an emergency was alleged to have existed.

We are urged in effect to imply that since the constitution has not, in so many words, given the Governor the power to reapportion the frozen Senate, that it intended to "specifically deny" or "prohibit" him from exercising this power even on an interim basis.

The observation of Justice Miller in Ex parte Yarbrough [18] is appropriate to be considered in relation to the problem of constitutional construction before us. The question before the court was whether an act of Congress punishing conspiracies to intimidate any citizen in the free exercise of his vote was constitutional. The opinion states at 110 U.S. 658, 4 S.Ct. 155, 28 L.Ed. 276:

> The proposition that it has no such power is supported by the old argument often heard, often repeated, and in this court never assented to, that when a question of the power of congress arises

the advocate of the power must be able to place his finger on words which expressly grant it. The brief of counsel before us, though directed to the authority of that body to pass criminal laws, uses the same language. Because there is no *express* power to provide for preventing violence exercised on the voter as a means of controlling his vote, no such law can be enacted. It destroys at one blow, in construing the constitution of the United States, the doctrine universally applied to all instruments of writing, that what is implied is as much a part of the instrument as what is expressed. (Justice Miller's emphasis)

Appellant aptly quotes the famous observation of Justice Holmes in Bain Peanut Co. v. Pinson [19] that:

> The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints.

In M'Culloch v. Maryland [20] the Supreme Court of the United States held that there was nothing in the Constitution of the United States which excluded incidental or implied powers. Chief Justice Marshall stated:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

The court held that Congress had the implied power to incorporate the Bank of the United States, establish branches in the states and that the states could not tax them.

In Gibbons v. Ogden [21] the Supreme Court of the United States held that the specific constitutional grant to Congress

---

18.  110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884).

19.  282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482, 491 (1930).

20.  4 Wheat. 316, 421, 4 L.Ed. 579, 605 (1819).

21.  9 Wheat. 1, 189, 6 L.Ed. 23, 68 (1824).

of the power " * * * to regulate commerce * * *" implied the exclusive power to regulate navigation.

The foregoing historic decisions have greatly influenced the affairs of our nation and demonstrate the wisdom of Justice Holmes' admonition that the interpretation of constitutional principles must not be too literal. The court, in M'Culloch v. Maryland could have held that since the constitution did not specifically so authorize, Congress could not incorporate a bank or establish branches. If the court in Gibbons v. Ogden had applied a literal construction to the grant of power to Congress " * * * to regulate commerce * * *" and held that since navigation was not specifically mentioned it was not to be logically implied as an included power, it would have gone unregulated to the extent that it is today, to the detriment of our national welfare.

Appellant has appropriately referred us to the observation of Justice Stone in United States v. Classic: [22]

> We may assume that the framers of the Constitution in adopting that section, did not have specifically in mind the selection and elimination of candidates for Congress by the direct primary any more than they contemplated the application of the commerce clause to interstate telephone, telegraph and wireless communication which are concededly within it. But in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government.

■ The facts before us were not anticipated by the Convention. It is appropriate, therefore, that we attempt to determine from Article VI as a whole and appropriate Convention Minutes, what was the pervading purpose and intent of the Convention. We must then determine whether a fair interpretation of the various provisions of Article VI will support a construction which permits accomplishment of this purpose, bearing in mind that often " * * * what is implied is as much a part of the instrument as what is expressed."

Using this approach, we have concluded that it is more reasonable and logical to imply that had the Convention been able to anticipate the need to reapportion the Senate on an interim or any other basis, it would have specifically given the Governor the same power to reapportion the Senate as it gave him to reapportion the House. The Convention obviously believed that orderly and representative government required that some authority, other than the legislature, should periodically reapportion the House, rather than depend upon constitutional amendment or a constitutional convention to do this. We find no basis for inferring that had it known that the Senate would in the future require periodic reapportionment, that it would not have placed this responsibility in the Governor also, rather than leave it to the cumbersome, expensive, and demonstrably ineffective remedy of constitutional amendment which must be initiated by the legislature.

The Convention gave the Governor the power to alter Senate districts within limits. Since it justifiably felt in 1956, that the Senate could remain permanently frozen, there was no reason to grant the power to do any other thing with respect to representation in the Senate. What is significant is that, to the extent that any power was given with respect to the Senate, it was given to

22. 313 U.S. 299, 316, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368, 1378 (1940).

the Governor and the Reapportionment Board.

The Convention's reason for placing reapportionment authority and responsibility in the Governor was because over the years it had been forcefully demonstrated on a nationwide scale that state legislatures would not reapportion themselves. The more malapportioned they became with the passage of time, the less likely it became that the representatives would reapportion themselves out of office. Knowing that the Convention was aware of and attempting to avoid this national evil, it is only reasonable to imply that it would have required the Governor to periodically reapportion the Senate had it known that its frozen formula would be declared invalid.

Appellees argue that the Convention intended that the Senate be reapportioned only by constitutional amendment or by constitutional convention. Section 1, Article XIII of the Alaska Constitution provides that amendments to the constitution may be proposed by a two-thirds vote of each house of the legislature.[23] This may have been their intent when they believed that a "frozen" Senate could remain "frozen" forever. On the other hand, if they could have anticipated that the "frozen" Senate would become illegal and would require periodic reapportionment, it is almost a certainty that they would not have left reapportionment to be performed by constitutional amendment. A malapportioned Senate is no more likely to propose a constitutional amendment to reapportion itself than it would be to perform reapportionment on itself. Section 2, Article XIII states that "The legislature may call constitutional conventions at any time." But there would be no more reason to expect that a malapportioned Senate would join in calling a constitutional convention to reapportion many of its seats than it would be to voluntarily reapportion itself. We know the Convention was aware of these facts. The most logical assumption, therefore, is that had it been able to anticipate Baker v. Carr, the Convention would undoubtedly have rescued the people from the same evil that it had saved them from as to the House and have given the Governor the power and duty to reapportion the Senate.[24]

Appellees quote and rely upon an exchange between Delegate McNealy, Chairman Hellenthal and Delegate Nolan, reported in Minutes of Alaska Constitutional Convention pages 1884–87 as evidencing a Convention intent relevant to the construction question before us. Delegate McNealy's question, in substance, was to inquire of Chairman Hellenthal whether, under the proposed frozen Senate apportionment based on area, if the population of the Fourth Judicial District increased to twice

23. Sec. 1, Art. XIII states:
     Amendments to this constitution may be proposed by a two-thirds vote of each house of the legislature. The secretary of state shall prepare a ballot title and proposition summarizing each proposed amendment, and shall place them on the ballot for the next statewide election. If a majority of the votes cast on the proposition favor the amendment, it shall be adopted. Unless otherwise provided in the amendment, it becomes effective thirty days after the certification of the election returns by the secretary of state.

24. That amendment by constitutional convention can be uncertain, cumbersome and expensive is evident. The malapportioned Senate must first voluntarily join in calling a constitutional convention for the purpose of reapportioning itself. There must then be a statewide election of delegates to the Constitutional Convention, the Convention itself and finally, ratification by the people. In the case before us the earliest that the legislature could call a constitutional convention would be January of 1967, unless a special session were called. It is unlikely therefore, that a convention could remedy Senate malapportionment before late 1967 or early 1968. The legislature can propose amendments to the constitution. In the case before us two-thirds of the members of the malapportioned Senate must agree to a proposed amendment to reapportion the Senate. The Secretary of State would then place the proposal on a ballot which would not be voted on by the people until the next statewide election. See: Sec. 1, Art. XIII Alaska Const.

that of the rest of Alaska and even though it was as large in area as all the rest of Alaska, would the Senatorial districts nevertheless remain the same? The following then transpired:

HELLENTHAL: That is correct.

McNEALY: And there would be a great possibility that they would never change?

HELLENTHAL: I would not attempt to say that.

McNEALY: I guess that is a political matter.

\*  \*  \*  \*  \*  \*

NOLAN: The third question is, I think it was answered in response to a question by Mr. McNealy, that the senatorial districts are fixed permanently without a constitutional amendment?

HELLENTHAL: That is correct, subject to the minor modification that we discussed last night and this morning, and which will be handed to you on this slip sheet this morning in a few minutes.

The most that can be said for the intent expressed by Delegate Nolan and Chairman Hellenthal in 1956 is that it had a definite relevance to Convention proceedings and compromises as of that time. It was entirely consistent with the existing national concept of fairness which permitted apportioning one body of a bicameral legislature based on area and freezing that apportionment. But the intent expressed then is not relevant to an analysis of the present problem. The delegates were conscientious, dedicated people. If they could have anticipated that their apportionment of the Senate would later be declared unfair and invalid, we do not believe they would have left the people of Alaska in the position of having to depend upon a malapportioned Senate to voluntarily propose a constitutional amendment or join in a call for a constitutional convention in order to correct what had been declared to be an unfairness.

We are convinced that the Alaska Constitutional Convention intended that reap-

portionment, to the extent provided for, be regularly performed, that the full authority and responsibility for carrying out this duty be placed on the Governor who could be forced to perform his duty by the courts at the instance of any qualified voter and who was to be assisted by the Reapportionment Board. No part of the authority or responsibility was intended to be entrusted to the legislature. It was not intended by the Convention that the frozen Senate ever be reapportioned because the delegates had finally agreed upon the "frozen", area apportionment plan of representation, only after long negotiation and compromise.[25]

Unanticipated changes in the law of the land have invalidated the Senate apportionment and now require that the Senate be expeditiously reapportioned on a population basis. Four years have elapsed since Baker v. Carr and two years since Reynolds v. Sims during which time the Alaska legislature has not called a constitutional convention or proposed a constitutional amendment to reapportion the Senate. The Governor and the Reapportionment Board have reapportioned the Senate in the same manner that the constitution requires them to reapportion the House.

■ An enlightened construction of Article VI which permits realization of its fundamental purpose, that reapportionment not be dependent in any manner on legislative initiative and that effective means of enforcement be readily available to any voter, is that its remaining constitutional provisions provide the implied power in the Governor and the Reapportionment Board to reapportion the Senate on an interim basis and we so hold.

Since the appellees do not question the validity of the reapportionment plan proclaimed by the Governor on September 3, 1965 with respect to the requirements of the equal protection clause of the Fourteenth Amendment, it is declared to be effective for the 1966 primary and general elections and thereafter until the Alaska Constitution

25. Minutes of Alaska Constitutional Convention p. 1881.

has been amended to provide a valid, permanent reapportionment plan for the Senate.

■■■ Since the evidence clearly established that under the existing constitutional apportionment of the Senate 30.7 per cent of the voters reside in districts which could elect a majority in the Senate, we affirm the superior court's judgment that the Alaska Senate is unconstitutionally apportioned and that Section 2, Article XIV of the Alaska Constitution is unconstitutional.

The remainder of the judgment below is set aside and it is ordered that a new judgment in accordance with the views expressed in this opinion be entered.

The foregoing decision makes it unnecessary to pass upon any of the other points briefed and argued by the parties.

RABINOWITZ, J., concurs in the result.

RABINOWITZ, Justice (concurring in the result).

Although I agree with the result reached by the majority, I differ with the majority's reasons for its conclusion. A search for the probable intent of the framers of Alaska's Constitution had they anticipated *Baker* and *Reynolds* involves considerable speculation. If speculation is apposite here, then it is just as logical to conclude that the framers would have vested reapportionment in the legislature had they anticipated that effective judicial relief from a malapportioned legislature would be available to any citizen by virtue of the reapportionment decisions of the United States Supreme Court. For the reasons stated hereafter, I would have avoided any attempt to determine the intent of the Alaska Constitutional Convention in this situation.

Subsequent to Alaska's admission to statehood on January 3, 1959, the United States Supreme Court in Baker v. Carr [1] held that the apportionment of state legislatures was subject to review by courts on equal protection grounds. Two years after this landmark decision, the United States Supreme Court concluded that both houses of a bicameral legislature must, under the Equal Protection Clause of the fourteenth amendment, be apportioned substantially on an equal population basis. The Supreme Court further held that it was immaterial whether or not the electorate had the remedy of the initiative or had in fact adopted a malapportioned legislature by majority vote. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964); WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. Forty-Fourth Gen. Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). These decisions of the Supreme Court have been characterized "as one of the most far-reaching series of decisions in the history of American constitutionalism." [2] In requiring equal population districts for both houses of a bicameral legislature, the Supreme Court articulated the constitutional standard in terms of "substantial equality of population among the various districts" [3] and "as nearly of equal population as is practicable." [4]

---

1. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

2. Dixon, Reapportionment in the Supreme Court and Congress: Constitutional Struggle for Fair Representation, 63 Mich.L.Rev. 209 (1964).

3. Reynolds v. Sims, supra, at 579, 84 S.Ct. at 1390, 12 L.Ed.2d at 537.

4. Id. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536. Note: The Supreme Court added

another test, namely a prohibition on "crazy quilts, completely lacking in rationality." Reynolds v. Sims, at 568, 84 S.Ct. at 1385, 12 L.Ed.2d at 531. Compare this latter test with the superior court's judgment where it is stated "that it dilutes their right to representation in the Alaska State Legislature on irrational bases."

Subsequent to the Supreme Court's historic decisions in the reapportionment cases, the Attorney General of the State of Alaska issued an opinion on August 17, 1964, advising the Governor that in his opinion the Governor had authority to reapportion the Senate. On August 18, 1964, the Governor issued a "Proclamation Concerning Reapportionment and Redistricting" which called the Advisory Reapportionment Board created by Alaska Constitution, article VI, section 8 into session. After holding publicized hearings throughout the state the Board submitted a report to the Governor on December 10, 1964. Thereafter, on March 6, 1965, the Governor issued a second "Proclamation Concerning Reapportionment and Redistricting" which reconvened the Advisory Board for another publicized ninety days of hearings and study. On June 8, 1965, the Board submitted a second report to the Governor. Then on September 3, 1965, the Governor issued the now questioned "Proclamation of Reapportionment and Redistricting" which was intended to govern the 1966 primary and general elections.

Review of the proposed reapportionment of the Senate under the Governor's September 3, 1965, "Proclamation of Reapportionment and Redistricting" demonstrates that the Senate would thereby be apportioned on the basis of substantially equal population districts in accordance with the Equal Protection Clause. Under the Governor's plan the maximum population-variance ratio is 1.47 to 1 contrasted to existing gross malapportionment ratio of 18.7 to 1. The theoretical minimum percentage of Alaska's population that could elect a majority of the Senate under the Governor's plan is 50.3 per cent of the voters. Under the existing constitutional provisions pertaining to apportionment of Alaska's Senate, 30.7 per cent of the voters reside in districts which theoretically may elect a majority in the Senate.

It is established that both federal and state courts may pass on the constitutionality of an apportionment scheme. In Maryland Comm. for Fair Representation v. Tawes,[5] the Supreme Court of the United States stated "We applaud the willingness of state courts to assume jurisdiction and render decision in cases involving challenges to state legislative apportionment schemes." [6] The issues pertaining to apportionment of Alaska's Senate raised below and now raised on appeal are properly before this court for adjudication.

I am of the opinion that the superior court correctly held that the Alaska Senate is unconstitutionally apportioned under the Equal Protection Clause standards articulated by the United States Supreme Court in *Reynolds* and its companion reapportionment decisions. Whether the maximum population-variance ratio [7] or the theoretical minimum percentage of population which

5. Supra page 701, 377 U.S. at 674, 84 S.Ct. at 1439, 12 L.Ed.2d at 607.

6. See also Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 1527, 14 L.Ed.2d 477, 478 (1965), where in a per curiam opinion the Supreme Court said:
   We believe that the District Court should have stayed its hand. The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.
   Note: Subsequent to the superior court's entry of judgment in this case an action

was filed in the United States District Court for the District of Alaska. Plaintiffs in this federal action seek in part a declaration as to the unconstitutionality of the Alaska Const. art. XIV, § 2; an injunction against the superior court's ordering of elections to be held pursuant to art. XIV, § 2; and request the District Court to adopt a provisional plan of apportionment for the Senate for purposes of the forthcoming 1966 primary and general elections.

7. This ratio is obtained by comparing the largest to the smallest population per member of the legislative body in question.

could elect a majority of the Alaska Senate [8] is used as the measure of representativeness, the conclusion is the same. The "frozen" apportionment of the Alaska Senate under our constitution has resulted in a grossly malapportioned Senate. The existing apportionment of the Alaska Senate provided for under our constitution fails to meet the Equal Protection Clause's standards of "substantial equality of population among the various districts" or that of Senate election districts composed of "as nearly of equal population as is practicable." In short, the right to vote of appellees, and all other persons similarly situated, for state senators is unconstitutionally impaired and diluted under the existing apportionment of the Alaska Senate. Therefore, article XIV, section 2 of the Alaska Constitution is unconstitutional.

The right to vote in question in this case is an individiual and personal right protected by the Equal Protection Clause. This was made clear in *Reynolds*,[9] where the Supreme Court said:

A predominant consideration in determining whether a State's legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature. As stated by the Court in United States v. Bathgate, 246 U.S. 220, 227, 38 S.Ct. 269, 271, 62 L.Ed. 676 [680], '[t]he right to vote is personal * * *.' While the result of a court decision in a state legislative apportionment controversy may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial

focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote.

Under the reapportionment decisions of the United States Supreme Court to which I have previously alluded, it is the function of this court to assure adherence to the Equal Protection Clause. My view of the manner in which this personal constitutional right of the electorate in the State of Alaska is to be vindicated differs from that held by the court below. Crucial to my conception of an apposite remedial vindication of this constitutionally protected right is that portion of *Reynolds* [10] where, in regard to the timing of an appropriate remedy, the Supreme Court stated:

Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. *It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.* In awarding or withholding immediate relief, a court is entitled to and should consider the

8. This theoretical minimum percentage is obtained by ranking the various Senate election districts from the smallest population per member to the largest and then accumulating from the smallest district upwards until the point is reached where a given percentage of the population has the power to elect a majority of the Senate.

Other measurement tests, such as percentage deviation from the ideal district, also demonstrate that the Alaska Senate is grossly malapportioned.

9. Id. 377 U.S. at 561, 84 S.Ct. at 1381, 12 L.Ed.2d at 527.

10. Id. 377 U.S. at 585, 84 S.Ct. at 1393, 12 L.Ed.2d at 541.

proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. (Emphasis furnished.) [11]

Inherent in the decision of this case is an element which had been aptly characterized by counsel for appellees as that of "balancing"—that is the weighing of the necessity for vindication of the individual's constitutionally protected right to vote for a constitutionally apportioned legislature against the interest of affording the "proper political agencies" of the State the opportunity to reapportion the Alaska Senate prior to the adoption by the courts of any interim reapportionment plan. In appellees' view, the proper political agencies are either a constitutional convention or legislatively initiated amendment to Alaska's Constitution providing for reapportionment of the Senate. In view of the total circumstances of this case and under my interpretation of *Reynolds,* I am of the opinion that the superior court erred in not adopting an interim reapportionment plan once the court found article XIV, section 2 unconstitutional. On the balance, I conclude that considerations compelling the taking of appropriate action to effectuate the right to vote involved here and "to insure that no fur-

ther elections are conducted under the invalid" provisions of article XIV, section 2 of the Alaska Constitution are paramount.

I reach this conclusion for the following reasons. First: I find lacking the "unusual case" which would justify the superior court's refraining from undertaking appropriate action to insure that no further elections were conducted under article XIV, section 2's unconstitutional apportionment plan. Admittedly when this case was before the superior court, the impending primary election was imminent.[12] Yet the then existing circumstances in regard to the impending primary are perhaps unique in the history of apportionment litigation since *Reynolds.* This element of uniqueness is derived from the fact that subsequent to the issuance by the Governor of his September 3, 1965 "Proclamation of Reapportionment and Redistricting" appellant had taken steps to carry out the Governor's reapportionment plan and candidates had filed under this reapportionment plan. Whatever dislocation or interference in the State's election machinery that has occurred is attributable to the superior court's judgment which, on April 12, 1966 (for the first time in regard to the 1966 primary and general elections), brought into play the invalid apportionment scheme called for by article XIV, section 2 of the Alaska Constitution. In light of these circumstances, what I find lacking are relevant equitable principles which would justify departure from the implementation mandate of *Reynolds* in regard to the formulation of an appropriate judicial remedy.[13]

---

11. In 79 Harv.L.Rev. 1228, 1266 (1966), it is stated:
   A court must decide two questions when it fashions a remedy: (1) *whether the next election is so imminent that the court should not interfere in the election process at all,* and (2) if it does decide to act, either before the election or after it, what remedy is then most appropriate. (Emphasis furnished.)

12. The filing deadline for the primary election is June 1, 1966.

13. In reaching this conclusion I reject appellant's contention that the reapportion-

ment decisions of the Supreme Court of the United States have established the year 1966 as the mandatory national deadline for reapportionment of a malapportioned state legislature. I do not interpret the cases cited by appellant as establishing such a deadline but do construe Reynolds and the other cited authorities as requiring a more accelerated compliance than was imposed under the "with all deliberate speed" formula in the public school segregation cases.

Secondly: On June 15, 1964, the United States Supreme Court rendered its decision in *Reynolds* and five companion cases. Since that time no action has been initiated by the Alaska legislature to reapportion the Senate by amendment to our constitution.[14] In contrast, as I previously noted, the Governor of Alaska commenced steps on August 18, 1964, to reapportion the Senate. After statewide meetings and hearings, the Advisory Reapportionment Board furnished the Governor with two separate reports, all of which culminated in the presently contested September 3, 1965, "Proclamation of Reapportionment and Redistricting."

In light of these circumstances, any "balancing task" becomes less difficult. I do not find it unreasonable to give preference to the individual's constitutionally protected right of equality to vote in light of the fact that the Governor with the Advisory Board has already had the opportunity to study the political implications of Senate reapportionment. The amended decree which I would fashion today still leaves available to appellees an effective right under article XIII to have the apportionment articles of the Alaska Constitution amended by either

legislative initiative or constitutional convention. I cannot discern how this right to obtain constitutional amendment is made any less effective, or becomes diluted in any way, by the presence of a constitutionally apportioned legislature elected pursuant to an interim plan embodying the Governor's reapportionment plan.

Thirdly: The conclusion I reach is based on the following additional considerations. As indicated earlier, it is now established by virtue of Scott v. Germano[15] and Maryland Comm. for Fair Representation v. Tawes[16] that state courts have authority to formulate remedial interim reapportionment and redistricting plans. It has also been held in states where boards or commissions are vested with reapportionment authority that the courts will defer to such boards or commissions instead of to the legislature for the establishment of reapportionment plans.[17] In states where the legislature is not vested with the function of reapportionment (i. e. where reapportionment of a "frozen house"[18] can be accomplished only through constitutional amendment) courts, when necessary, have allowed such legislatures to enact reapportionment plans.[19]

My construction of Reynolds and subsequent Supreme Court decisions differs from that of appellees' as to the timing of appropriate remedial techniques. Appellees argue that courts are permitted to fashion judicial remedies in malapportioned cases only in the instance where there is "sufficient time prior to the [next] election for the properly authorized political agencies to act so as to produce a valid plan, and those agencies fail to act." I interpret Reynolds as imposing upon the courts the duty to fashion an appropriate judicial remedy, once malapportionment has been found, unless due to the imminency of the next election equitable considerations militate against judicial intervention.

14. That is either by an amendment proposed by two-thirds of the legislature or by the calling of a constitutional convention. During the same period the legislature has taken no steps to attempt to reapportion the Senate on an interim basis.

15. Supra note 6.

16. Supra page 701.

17. Yancey v. Faubus, 238 F.Supp. 290 (E.D.Ark.1965) ; In re Apportionment of Michigan State Legislature, 373 Mich. 250, 128 N.W.2d 722 (1964).

18. As used in this opinion the term "frozen house" signifies a legislative body whose election districts are constitutionally prescribed and there is no requirement, or body vested with the authority, to reapportion periodically.

19. Maryland Comm. for Fair Representation v. Tawes, supra page 701, at 377 U.S. at 675–676, 84 S.Ct. at 1439, 12 L. Ed.2d at 607 ; Buckley v. Hoff, 243 F. Supp. 873 (D.Vt.1965) ; Buckley v. Hoff, 234 F.Supp. 191 (D.Vt.1964), modified, Parsons v. Buckley, 379 U.S. 359, 85 S.Ct. 503, 13 L.Ed.2d 352 (1965) ; Butterworth v. Dempsey, 229 F.Supp. 754 (D.Conn.), aff'd sub nom. Pinney v. Butterworth, 378 U.S. 564, 84 S.Ct. 1918, 12 L.Ed.2d 1037 (1964).

These factors, in addition to those previously mentioned, have led me to conclude that an apposite judicial remedy in view of the unconstitutionality of article XIV, section 2 is the adoption by this court of the Governor's reapportionment plan on interim basis. In my view it is unnecessary to decide the issue of whether the Governor possesses the power to reapportion the Alaska Senate on an interim basis. I would limit this court's holding to the grounds that under the circumstances of this case the superior court should have, in formulating an appropriate remedy, adopted an interim reapportionment plan.

Despite any reservations I may entertain as to whether the goal of "fair and effective representation for all citizens"[20] will be realized through the standards articulated by the United States Supreme Court in its reapportionment decisions, this court is bound to insure compliance with the Equal Protection Clause.

For the foregoing reasons I would affirm paragraph number one of the superior court's judgment which declared unconstitutional article XIV, section 2 of the Alaska Constitution. I would also affirm paragraph number three of the superior court's judgment under which the superior court retained jurisdiction of the case to insure that "a valid constitutional amendment modifying the apportionment of the Alaska State Senate" is enacted and adopted by December 1, 1967.[21] Further, I would set aside in its entirety paragraph number two of the superior court's judgment and would amend paragraph number two to read as follows:

The court adopts as an interim plan of apportionment for the Alaska Senate the reapportionment plan provided for in the Governor's September 3, 1965, "Proclamation of Reapportionment and Redistricting." The Secretary of State is to conduct the 1966 primary and general elections for the State Legislature pursuant to the interim reapportionment plan adopted herein.

20. Reynolds v. Sims, supra page 701, at 377 U.S. 565–566, 84 S.Ct. at 1383, 12 L.Ed.2d at 529.

21. In the event such an amendment is not adopted by December 1, 1967, the superior court has retained jurisdiction to "enter such orders as are necessary to insure that the 1968 primary and general elections will proceed only under an apportionment plan which is consistent with the fourteenth amendment to the federal constitution."