KENAI PENINSULA BOROUGH, Onis King and Anne King, voters and residents of Nikiski Precinct 1; Karen McGahan and Richard McGahan, voters and residents of Nikiski Precinct 2; Marie Walli, voter and resident of Anchor Point Precinct; John Douglas, voter and resident of Salmatof Precinct; Stewart Brandon, voter and resident of Nikiski Precinct 2; Thelma McConnell, voter and resident of Nikiski Precinct 2; Delores Rappe, voter and resident of Nikiski Precinct 1; Terry King, voter and resident of Nikiski Precinct 2; Charles Crabaugh, voter and resident of Nikiski Precinct 2; Norman McGahan, voter and resident of Nikiski Precinct 2; and Caroline Huhndorf, voter and resident of Nikiski Precinct 2; Appellants,

v.

STATE of Alaska, Appellee.

Jim CRAWFORD, Appellant,

v.

STATE of Alaska, Appellee.

Nos. S–1207, S–1216.

Supreme Court of Alaska.

Oct. 2, 1987.
Rehearing Denied Nov. 10, 1987.

Robert C. Erwin, Erwin & Smith, Anchorage, for Kenai Peninsula Bor. et al.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for Jim Crawford.

Jonathan B. Rubini, Asst. Atty. Gen., Juneau, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C.J., and BURKE, COMPTON, and MATTHEWS, JJ.

RABINOWITZ, Chief Justice.

At issue in this appeal is the validity of the 1984 state legislative reapportionment plan which was promulgated in an attempt to comply with our decision in *Carpenter v. Hammond,* 667 P.2d 1204 (Alaska), *appeal dismissed for want of substantial federal question,* 464 U.S. 801, 104 S.Ct. 45, 78 L.Ed.2d 67 (1983). This appeal challenges the constitutionality of the plan's realignment of Southeastern Alaska; the creation of House District 7, the North Kenai–South Anchorage District; and the creation of Senate District E, a two-member senate district composed of the Prince William Sound, North Kenai–South Anchorage, and Matanuska–Susitna House Districts.

We hold that the realignment of Southeast Alaska effectuates consistent and rational state policies and therefore does not violate the equal protection clauses of either the Federal or Alaska Constitution, and that the creation of the North Kenai–South Anchorage District satisfies the Alaska Constitution's contiguity, compactness, and socio-economic integration requirements. We conclude, however, that the creation of Senate District E impermissibly discriminates against Anchorage voters under Alaska's equal protection clause.

## I. BACKGROUND.

### A. *Proceedings.*

In *Carpenter v. Hammond*, 667 P.2d 1204, 1215 (Alaska 1983), we held that the 1981 state legislative reapportionment plan's inclusion of Cordova in House District 2 (the Inside Passage District) violated article VI, section 6 of the Alaska Constitution because of the lack of any evidence of significant social and economic interaction between Cordova and the rest of the communities comprising the district. We remanded the case to the superior court, which entered an order directing the Governor of Alaska to issue a revised Proclamation of Reapportionment locating Cordova within a contiguous, compact and relatively integrated socio-economic election district. In 1983 the Reapportionment Board (Board) convened for the purpose of recommending amendments to the 1981 reapportionment plan which would comply with *Carpenter* and with the superior court's order on remand.

The Board submitted to the governor a modified plan which in part proposed the following redistricting and reapportionment:

(1) the realignment of Southeastern Alaska by removing Cordova from House District 2 and placing it within House District 6 (the Prince William Sound District), including Metlakatla and Hoonah (formerly part of House Districts 1 and 3, respectively) in House District 2, and retaining a unified Juneau District (House District 4);

(2) the realignment of Southcentral Alaska by redrawing House District 7 (the North Kenai–South Anchorage District) to include North Kenai (Nikiski), Portage, Girdwood and portions of South Anchorage; and

(3) the creation in Southcentral Alaska of Senate District E (the "Donut" District), a two-member senatorial district composed of House Districts 6 and 7 combined with House District 16 (the Matanuska–Susitna District).

On February 16, 1984, Governor William Sheffield issued an Executive Proclamation of Reapportionment and Redistricting adopting the Board's proposed plan. Subsequently, the Kenai Peninsula Borough and several residents of House District 7 (collectively referred to as "Kenai") filed suit against the state, alleging that the new plan failed to comply with our order in *Carpenter* and violated both the Alaska and Federal Constitutions. After trial without a jury, the superior court dismissed the complaint with prejudice. This appeal followed.

### B. *Challenged Aspects of the Plan.*

#### 1. *Southeastern House Districts.*

The Board's principal decision in formulating the 1984 reapportionment plan was the removal of Cordova from House District 2 and the retention of a unified Juneau District. This decision resulted in a total deviation from the ideal district population size for house districts of 14.8%.[1] The communities of Metlakatla and Hoonah, which formerly comprised parts of House Districts 1 and 3, respectively, were added to District 2 in order to replace most of the 2,200 Cordova residents. The Board noted that this proposed configuration was the

---

**1.** Total deviation from ideal district population size is determined by adding the percentage of the least populated district in the state to the percentage deviation of the most populated district. Ideal district population size is determined by dividing the total population of Alaska by the number of seats in the legislature to be apportioned, forty house seats for house districts and twenty senate seats for senate districts. Based on 1980 census data, the ideal house district population is 9,210.5 and the ideal senate district population is 18,421.

only identified means of retaining the Inside Passage District, which was devised to unite small rural communities in Southeastern Alaska and to facilitate review under the Voting Rights Act of 1965.[2]

The Board considered and rejected a series of proposals to move a portion of the Juneau community into another house district because the Juneau District retains the boundaries of a political subdivision and because maintaining all of Juneau as a two-member house district recognizes the unique social and economic nature of the community. The Board reasoned that while other Southeastern communities depend principally on fishing and timber, Juneau is inextricably tied to the operation of state government. The state directly employs approximately 4,000 people in Juneau, and tourism, not fishing or timber, is the community's second principal economic activity. The Board believed that a division of Juneau might contravene the state constitutional requirement of social and economic integration within the district.[3]

### 2. House District 7 (the North Kenai–South Anchorage District).

House District 7 contains:
the Nikiski area on the northern Kenai Peninsula, and the southeastern reaches of the Municipality of Anchorage, including the community council areas of Old Seward/Oceanview, Rabbit Creek, Turnagain Arm, and Girdwood Valley. Its northern boundary proceeds east from Turnagain Arm along Klatt Road to the New Seward Highway, southerly on the New Seward Highway to Huffman Road, westerly along Huffman Road to the Old Seward Highway, southerly on the Old Seward Highway to DeArmoun Road, east on DeArmoun Road to Rabbit

Creek, and easterly and southerly along Rabbit Creek.

District 7 has a population of 9,580.1 and thus a deviation from ideal district population size of + 4.0%.

The record indicates that the Board based its decision to include Nikiski in District 7 on several factors. First, the 1981 reapportionment plan included the North Kenai communities and South Anchorage in the same senate district. Second, and of greater significance, the Board was convinced that the North Kenai–South Anchorage districting link was supported by substantial social, economic, and political underpinnings. The drawing of District 7 also reflected the Board's belief in a lack of available alternatives. Relocation of Cordova in District 6 resulted in an unacceptably large population base in the Southcentral area, and the Board concluded that creating the North Kenai–South Anchorage District was the only way to meet federal constitutional population standards while minimizing the number of changes to the overall 1981 plan. The Board considered the creation of a four-member district composed of proposed Districts 5 (the Kenai–Cook Inlet District), 6 (the Prince William Sound–Kenai District) and 7 (the North Kenai–South Anchorage District), but believed that the establishment of a multi-member district solely to achieve population parity would raise equal protection concerns and that the multi-member district would simply recast, rather than resolve, the social and economic integration concerns. The Board also took the position that its decision was no more problematic than the 1981 plan which linked North Kenai to Seward and Valdez, because North Kenai's

**2.** The Board observed that the Voting Rights Act of 1965, as amended, aims to preserve the voting prerogatives of minority voters, and that the proposed modification of District 2 increased the native population within the district from 27.5% to 41.9%. See 42 U.S.C. § 1973c.

**3.** Alaska Const. art. VI, § 6, provides:
 *Redistricting.* The governor may further redistrict by changing the size and area of election districts, subject to the limitations of this article. Each new district so created shall be

formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area. Each shall contain a population at least equal to the quotient obtained by dividing the total civilian population by forty. Consideration may be given to local government boundaries. Drainage and other geographic features shall be used in describing boundaries wherever possible.

links to Anchorage are stronger than its tie to those communities.

### 3. *Senate District E (the "Donut" District).*

Senate District E is a two-member district composed of House Districts 6, 7, and 16, with a population of 36,025.52 and a deviation from ideal district population size of −2.2%. The Board created this district to respond to public dissatisfaction with the former senate configuration linking House Districts 5, 6, and 7, and to retain the balance between regional and Anchorage senate representation.[4] Based on testimony it received and the personal knowledge of its members, the Board's view was that a single-member senate district made up of House Districts 6 and 7 would become an "Anchorage" seat. The Board believed that alignment of Districts 6, 7, and 16 into a two-member senate district provided a strong foundation for regional representation. It found that the bulk of the senate district population was located in communities "in which the economic focus is independent of Anchorage in some respects, substantially intertwined in others," and would share a common communication and transportation network.

One Board member testified that the Board attempted, to the extent possible, to leave traditional groupings intact. She added that it heard considerable testimony from members of the Prince William Sound communities who believed that combining House District 16 with Districts 6 and 7 to

create a two-member senate district would "be[ ] a way in which to distribute political power in such way that the Prince William Sound, ... the Nikiski area and the Mat[anuska]–Su[sitna area] could be balanced."

## II. STANDARD OF REVIEW.

*Groh v. Egan,* 526 P.2d 863 (Alaska 1974), established, and *Carpenter* reaffirmed, the standard of review that we apply in exercising our jurisdiction to review reapportionment decisions under Alaska Constitution article VI, section 11.[5]

"It cannot be said that what we may deem to be an unwise choice of any particular provision of a reapportionment plan from among several reasonable and constitutional alternatives constitutes 'error' which would invoke the jurisdiction of the courts.

We view a plan promulgated under the constitutional authorization of the governor to reapportion the legislature in the same light as we would a regulation adopted under a delegation of authority from the legislature to an administrative agency to formulate policy and promulgate regulations. We have stated that we shall review such regulation first to insure that the agency has not exceeded the power delegated to it, and second to determine whether the regulation is reasonable and not arbitrary. Of course, additionally, we always have authority to review the constitutionality of the action taken, but we have stated that a court

**4.** After the Board had formulated tentative decisions concerning revisions of house district boundaries, it circulated for public review and comment several options as to possible senate district configurations. Anchorage residents expressed strong support for single-member senate districts, but the Board concluded that rejection of the two-member configuration established under the 1981 plan would be beyond the scope of its mandate to propose amendments thereto which rectify the deficiencies identified in *Carpenter.* Residents of "the south coast communities" argued against retaining the two-member senate district comprising of House Districts 5, 6, and 7 on the basis that the Prince William Sound communities did not share common interests with the Kenai Peninsula communities. In response, the Board first established one single-member senate district for House

District 5, and one for House Districts 6 and 7. However, it became apparent that, if the then-current population trends continued, South Anchorage would effectively dominate the latter district and would submerge the voting strength of the Prince William Sound communities, while adding another "Anchorage" senate seat.

**5.** Alaska Const. art. VI, § 11, provides in pertinent part:

Application to compel correction of any error in redistricting must be filed within thirty days following the proclamation. Original jurisdiction in these matters is hereby vested in the superior court. On appeal, the cause shall be reviewed by the supreme court upon the law and the facts.

may not substitute its judgment as to the sagacity of a regulation for that of the administrative agency, and that the wisdom of a given regulation is not a subject for review."

. . . .

... In short, our review is meant to ensure that the reapportionment plan is not unreasonable and is constitutional under article VI, section 6 of Alaska's constitution.

*Carpenter,* 667 P.2d at 1214 (quoting *Groh,* 526 P.2d at 866–67).

Article VI, section 11 also compels us to consider facts de novo upon the record developed in the superior court in reviewing a reapportionment plan. *Groh,* 526 P.2d at 867.

### III. DOES THE TOTAL DEVIATION OF 14.8% BETWEEN ELECTION DISTRICTS VIOLATE THE EQUAL PROTECTION CLAUSE OF EITHER THE UNITED STATES OR ALASKA CONSTITUTION?

House Districts 1 and 4 (the Ketchikan–Wrangell–Petersburg and Juneau Districts) have deviations from ideal district population size of $-9.9\%$ and $+4.9\%$, respectively, resulting in a total deviation of 14.8%. Because these districts are respectively the least and most populated districts in the state, combining their percentage devia-

tions yields the total deviation under the reapportionment plan—that is, the deviation from population equality of all districts in the state, not merely the deviation of the districts in Southeastern Alaska alone.[6] Kenai argues that the state must justify this total deviation as necessary to effectuate a rational state policy and that the "rational state policies" identified in the superior court's decision are insufficient as a matter of constitutional law because they do not in fact represent uniform and coherent statewide policies.[7]

The state concedes that it must make a good faith attempt to achieve population equality among all the districts in the state and must justify deviations greater than 10% but less than 16.5% on the basis of a rational state policy. The United States Supreme Court has held that while the equal protection clause of the Federal Constitution does not require precise numerical equality of population in state legislative districts, "a State [must] make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964). Any divergence from strict population equality must be "based on legitimate considerations incident to the effectuation of a rational state policy."[8] *Id.* at 579, 84 S.Ct.

---

**6.** The deviation from ideal district population size for Southeastern Alaska alone is obviously also 14.8%, since both the state's least and most populated districts are located there. The percentage deviation for house districts outside Southeastern Alaska is 9.3%, ranging from $+4.4\%$ to $-4.9\%$; for senate districts outside Southeastern Alaska, 6.4%, ranging from $+4.2\%$ to $-2.2\%$.

**7.** The superior court cited three policy objectives advanced by the plan's configuration: the inclusion of the Juneau Borough within a single district; the inclusion of the small, rural Native communities in Southeastern Alaska in a common district; and the promotion of the voting prerogatives of Native voters. The court also found that the configuration is "the districting option with the lowest corresponding comparative population variation which advances the[se] three policy objectives," and that no other identified districting option would similarly achieve these objectives.

**8.** In *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), the Supreme Court reaffirmed and expanded upon *Reynolds:*

[W]e have held that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State. The ultimate inquiry, therefore, is whether the legislature's plan "may reasonably be said to advance [a] rational state policy" and, if so, "whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits."

*Id.* at 842–43, 103 S.Ct. at 2696, 77 L.Ed.2d at 221–22 (citations omitted) (quoting *Gaffney v.*

at 1390–91, 12 L.Ed.2d at 537. In *Groh*, we articulated our adherence to this doctrine, holding

> [t]hat in the absence of a showing that the manner of reapportioning a state was improperly motivated or had an impermissible effect, deviations of up to ten percent require no showing of justification. The state, however, has the burden of showing that deviations in excess of ten percent are "based on legitimate considerations incident to the effectuation of a rational state policy."

526 P.2d at 877 (footnotes omitted) (quoting *Reynolds*, 377 U.S. at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537).

In evaluating reapportionment plans in the past, we have not ignored the unique character of Alaska in distinguishing between state policies which justify deviations from districts of equal population size greater than 10% and those which have not.

> At the outset we recognize the difficulty of creating districts of equal population while also conforming to the Alaska constitutional mandate that the districts "be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area." When Alaska's geographical, climatical, ethnic, cultural and socio-economic differences are contemplated the task assumes Herculean proportions commensurate with Alaska's enormous land area. The problems are multiplied by Alaska's sparse and widely scattered population and the relative inaccessibility of portions of the state. Surprisingly small changes in district boundaries create large percentage variances from the ideal population.

*Egan v. Hammond*, 502 P.2d 856, 865 (Alaska 1972) (footnotes omitted) (quoting Alaska Const. art. VI, § 6).[9] *Groh* is further instructive in regard to what state policies may justify a population deviation in excess of 10%. There justification for the percentage deviations of the house districts for the Wrangell–Petersburg area and Juneau lay in the separation of Southeastern Alaska from Southcentral Alaska by 225 air miles and in the historically and geographically valid reasons for not creating a district which joined the southeastern and southcentral regions. 526 P.2d at 879. Specifically, we found that the Board had a rational basis for not severing Skagway and Haines from Juneau because of their close transportation ties to Juneau by daily air flights and frequent ferry service; the close historical linkage between the three communities, with Juneau serving as the economic hub for Haines and Skagway; and the distinctness of the district from the remainder of Southeastern Alaska by virtue of the nature of its development and composition, being comprised almost entirely of portions of the mainland rather than islands of the archipelago. *Id.* at 879. With respect to the Wrangell–Petersburg District, we concluded that the Board's attempt to implement the policy expressed in the constitution of achieving as nearly as practicable, a contiguous, compact territory containing a relatively integrated socio-economic area justified the 9.3% overrepresentation of the district. *Id.* at 879. Finally, we also deemed the 6.5% and 5.7% overrepresentation in the Aleutian Chain and Kodiak Districts, respectively, adequately justified on the ground that there appeared to be no feasible means of adding additional areas of population to those districts without worsening the existing imbalance. *Id.* at 879–80.[10]

*Cummings,* 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298, 307 (1973); *Mahan v. Howell,* 410 U.S. 315, 328, 93 S.Ct. 979, 987, 35 L.Ed.2d 320, 332 (1973)). *Brown* noted that among the legitimate state objectives which would justify such deviations were maintaining the integrity of various political subdivisions and providing for compact and contiguous districts. *Id.* at 842, 103 S.Ct. at 2696, 77 L.Ed.2d at 221.

9. In *Egan* we held the 1971 apportionment plan invalid because no adequate justification was

offered for percentage deviations from ideal district population size ranging from +23.35% to −45.93% in the house districts and from +26.14% to −7.2 in the senate districts. *Id.* at 868.

10. While acknowledging in *Groh* that the creation of house districts coterminous with boundaries of regional corporations established under the Alaska Native Claims Settlement Act "might constitute justification for some population deviation," we found that none of the chal-

We now turn to the various justifications which the state has advanced in this case. With respect to retention of a unified Juneau District, the state sought to preserve Juneau's political boundaries. Although the Board in its proposal did not keep intact the boundaries of other political subdivisions throughout the state, it did attempt "to leave traditional groupings together[;] but to the extent that [that] was not possible with the population [, it] had to make adjustments."

▐ The retention of political boundaries is a legitimate justification for a deviation from ideal district population size in excess of 10%, but this policy must be consistently applied to the state as a whole. *Cf. Kilgarlin v. Hill,* 386 U.S. 120, 123, 124, 87 S.Ct. 820, 822, 823, 17 L.Ed.2d 771 (1967) (purported state policy requiring apportionment plans to respect county boundaries rejected as justification for deviation, because the state permitted the crossing of county boundaries in the formation of districts to equalize undue population deviations and did not demonstrate why or how respect for county lines required the particular deviations in issue). Here the state

has crossed subdivision boundaries in creating districts; for example, Anchorage and Fairbanks were both divided. In light of this fact, the preservation of Juneau's political boundaries does not justify the deviation in issue because the districting of Juneau does not reflect implementation of a consistent state policy.

▐ We are of the view, however, that the retention of a unified Juneau District is incident to the effectuation of the state's policy to promote the contiguity, compactness and socio-economic integration of its communities. The state must consistently enforce the constitutional article VI, section 6 requirements of contiguity, compactness, and relative integration of socio-economic areas in its redistricting.[11] The City and Borough of Juneau comprises the former City of Douglas and Juneau, and the former Borough of Juneau. In the context of promoting social and economic integration, the unification of Juneau is reasonable. In contrast with the division of relatively similar districts in Anchorage that we rejected in *Groh,* the differences between Juneau and the outlying communities are sufficiently distinct to justify reten-

---

lenged districts tracked those boundaries and the deviations therefore remained unjustified. 526 P.2d at 877. Upon consideration of the attempt to justify the Nome District's deviation based on the unique Native composition of the community, the mining potential in the area, and the need for a "common port facility," we concluded that the makeup of the population in the Nome area did not vary significantly from that of adjoining villages and that the other reasons did not constitute considerations incident to the implementation of a rational state policy so as to justify a disparity of 15% over-representation. *Id.*

In *Groh* we also rejected the Board's reliance on neighborhood cohesiveness as a rational state policy justifying deviations. The Anchorage District boundaries were based on the Board's attempt to apply state policy as required by the mandate of article VI, section 6 of the Alaska Constitution that districts contain "as nearly as practicable a relatively integrated socio-economic area." *Id.* at 878. Having previously decided to divide Anchorage into six districts, the Board endeavored to identify like socio-economic areas based on the cost of housing, ethnic composition, income levels, transportation, growth and development plans. *Id.* However, the testimony showed that few if any homogeneous areas existed within Anchorage,

and although the patterns which the Board sought to delineate might have provided a basis for redistricting, they lacked "the necessary significance to justify the substantial disparities of 5.9, 6.5 and 8.6 percent." *Id.* at 879.

11. Article VI, section 6 requires that each new district created be a "socio-economic area" containing significant social and economic interaction. *See Carpenter,* 667 P.2d at 1215. "Socio-economic area," as used in this section, is explained in the minutes of the Constitutional Convention:

> Where people live together and work together and earn their living together, where people do that, they should be logically grouped that way.
>
> . . . .
>
> It cannot be defined with mathematical precision, but it is a definite term, and is susceptible of a definite interpretation. What it means is an economic unit inhabited by people. In other words, the stress is placed on the canton idea, a group of people living within a geographic unit, socio-economic, following if possible, similar economic pursuits. It has, as I say, no mathematically precise definition, but it has a definite meaning.

*Groh,* 526 P.2d at 878 (quoting Minutes, Constitutional Convention 1836, 1873).

tion of a unified Juneau District. We thus cannot say that the retention of a unified Juneau District is unreasonable or unconstitutional under article VI, section 6.[12] *See Carpenter,* 667 P.2d at 1214 (delineating this standard of review).

■ The redrawing of House District 2 to exclude Cordova and include Metlakatla and Hoonah also furthers the state policy of implementing the three elements of the article VI constitutional mandate. District 2 remains completely in the Southeast and as such is relatively compact.[13] The communities which it comprises are contiguous. Further, the record indicates that it satisfies the element of relative socio-economic integration in that the state's feeder ferry system connects almost all of the communities except Yakutat and almost all have local air taxi service several times daily; fishing is a major economic activity, and fishermen from all the communities fish throughout the entire district; the communities share a common interest in the management and disposition of state lands; and many of the communities are predominantly Native. Like the Juneau District upheld in *Groh,* District 2 effectuates a rational state policy because of the area's close transportation ties, unique development, and historical links. *See* 526 P.2d at 879.

■ The state also argues that the 14.8% total deviation from ideal district population size is justified because the creation of District 2 advances the policy of facilitating review under the Voting Rights Act by increasing the Native population in the district from 27.5% to 41.9%. A state may constitutionally reapportion districts to enhance the voting strength of minori-

ties in order to facilitate compliance with the Voting Rights Act, *United Jewish Orgs. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), but the Supreme Court has not decided whether such a redistricting will justify a total deviation greater than 10%. We need not decide that issue here, however, because the record in this case does not demonstrate a need to increase the Native population from 27.5% to 41.9% to effectuate a policy of compliance with the Voting Rights Act. Under section 5 of the Act, a reapportionment plan is invalid if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). However, the record here does not show a retrogression in the effective exercise of the electoral franchise would occur without the inclusion of a 41.9% Native population.[14] We thus conclude the state has not carried its burden of proving that the redrawing of House District 2 was necessary to effectuate a policy of compliance with the Voting Rights Act. Nevertheless, since the state has demonstrated that the redistricting of Southeastern Alaska effectuated other rational and consistent state policies under article VI, section 6, we hold that such redistricting did not violate the equal protection clause of either the Federal or Alaska Constitution.

## IV. DOES HOUSE DISTRICT 7 OR SENATE DISTRICT E VIOLATE ARTICLE VI, SECTION 6 OF THE ALASKA CONSTITUTION?

A. *House District 7.*

Kenai argues that House District 7 violates article VI, section 6 of the Alaska

12. It may be argued that application of article VI, section 6 is inconsistent to the extent it does not always result in districts coterminous with political boundaries. However, article VI, section 6 requires creation of relatively compact state legislative districts which may or may not cross the boundaries of political subdivisions. The consistency lies in its uniform application to the legislative districts rather than to political subdivision boundaries.

13. "Compact" in the sense used in article VI, section 6 "means having a small perimeter in

relation to the area encompassed. The most compact shape is a circle. Since it is not possible to divide Alaska into circles, it is obvious that the constitution calls only for relative compactness." *Carpenter,* 667 P.2d at 1218 (citation omitted) (Matthews, J., concurring).

14. The record indicates that the principal alternative proposal considered would have resulted in a district with a Native population of 28.9%, still above the 27.5% figure in the original District 2.

Constitution because there is no evidence of substantial socio-economic interaction between South Anchorage and North Kenai (Nikiski). Kenai contends that the evidence relied on by the superior court in reaching the opposite conclusion demonstrates only links between the Cities of Kenai and Anchorage, and that the standards established in *Carpenter* require significant interaction between the communities comprising the district as opposed to interaction between those communities and the surrounding areas. Kenai also asserts that any justification for the redistricting based on a lack of alternatives is invalid because we reversed and vacated the superior court's order to the extent that it required the governor to make the "fewest possible changes" from the 1981 plan in complying with the mandate of *Carpenter*. Kenai contends that the state is now estopped from arguing "necessity" based on the superior court's order because it successfully challenged that order.

The state argues that no constitutionally permissible alternative to joining North Kenai with South Anchorage existed. Based on its calculation that the Kenai Peninsula Borough alone supports approximately two and three-quarters house seats and the Prince William Sound communities of Cordova, Valdez, and Seward together cannot support a single seat, and that the two areas combined are too populated to support three seats but not sufficiently populated to support four seats, the state asserts that it could not form districts of nearly equal population without linking some portion of the Kenai Peninsula with South Anchorage. Furthermore, the state contends that including Nikiski in the Kenai district or in a three-seat regional district would result in overrepresentation of the district by 10.2% and a total (statewide) deviation in excess of the 16.4% maximum deviation permitted under the Federal Constitution. According to the state, the other alternative considered by the Board, a three-member regional district excluding Valdez and Cordova, would have required

those communities' inclusion in District 17 and thereby triggered a domino effect, causing strained district configurations throughout rural Alaska. The state contends that the Board could not both maintain a unified Juneau District and establish a three-member district composed of the Kenai Peninsula and Prince William Sound.[15] In support of the North Kenai–South Anchorage linkage, the state also asserts that the ties between the two are stronger than those established by the 1981 plan, which joined North Kenai in a district with Seward and Valdez, and stronger than those "implicitly identified as sufficient by this court in *Carpenter.*"

At the heart of this dispute is whether sufficient socio-economic integration of North Kenai and South Anchorage results from the former's interaction with Anchorage. The state argues that South Anchorage and Anchorage should be considered an indivisible area for the purpose of determining whether North Kenai's socio-economic ties with South Anchorage satisfy the constitutional mandate. Our review of the evidence reveals that actual interaction between the two areas is minimal. North Kenai and South Anchorage are essentially satellites of Kenai and Anchorage, respectively; to the extent that they interact at all, they do so as a consequence of the nexus between Kenai and Anchorage. For example, Nikiski has no high school of its own, so Nikiski students attend Kenai Central High School; Kenai Central plays in the Northern Lights Football Conference against Anchorage Christian High School, which South Anchorage students attend. Thus, to the extent that students from Nikiski and South Anchorage interact, it is through Kenai Central and Anchorage Christian. Similarly, as the state points out, the two areas are linked economically, because Anchorage-based professionals and financial institutions serve the needs of North Kenai developers with respect to major industrial activities in Nikiski, and because residents of both areas engage in

---

**15.** With Juneau kept intact, the creation of a three-member Kenai District would have result- ed in a total deviation of 18%.

commercial and sport fishing in the peninsula area; and linked socially, because residents of the areas share the same news and entertainment media and visit each other frequently.

In *Carpenter*, we found the record "devoid of evidence of significant social and economic interaction between Cordova and the remaining communities comprising House Election District 2," and accordingly held the inclusion of Cordova within the district constitutionally impermissible.[16] *Id.* at 1215. We thus construed article VI, section 6 to require sufficient evidence of socio-economic integration of the communities linked by the redistricting, proof of actual interaction and interconnectedness rather than mere homogeneity. *See id.* at 1218 (Matthews, J., concurring). The issue here thus becomes whether interaction between the communities comprising House District 7 and communities outside the district but within a common region sufficiently demonstrates the requisite interconnectedness and interaction mandated by article VI, section 6. We hold that it does.

 A reapportionment plan will be upheld if reasonable and not arbitrary. *See id.* at 1214. The sufficiency of the contacts between the communities involved here can be determined by way of comparison with districts which we have previously upheld. Unlike the district linking Cordova and the Southeast which we invalidated in

*Carpenter*, the communities of North Kenai and South Anchorage are relatively close geographically. Like the Juneau District upheld in *Groh*, which included Skagway and Haines, the communities here are connected by daily airline flights (and by highway transportation, whereas the Juneau communities used ferry service); both are linked to the hub of Anchorage, although North Kenai obviously has greater links to Kenai. We think Kenai draws too fine a distinction between the interaction of North Kenai with Anchorage and that of North Kenai with South Anchorage.[17] We find no error in the superior court's decision to uphold House District 7.[18]

## B. *Senate District E.*

 The state contends that the article VI, section 6 requirements should be less strictly applied with respect to the apportionment of senate seats because the provision explicitly pertains only to house districts and because the framers of the constitution sought to use senate districts to achieve regional representation. In the absence of a constitutional amendment to the contrary and given the framers' intent to use geographic area and rural representation as the criteria for apportioning senate seats, we hold that the article VI, section 6 requirements do not apply to the redistricting of senate seats.

16. Cordova was the only community in District 2 not located in Southeastern Alaska. We noted that the minutes of the Constitutional Convention supported the view that "election districts were intended to be composed of economically and socially interactive people in a common geographic region." 667 P.2d at 1215.

17. In *Groh*, we found that the state's criteria for districting Anchorage—housing, ethnicity, income levels, rates of growth and development—created districts that were too indistinguishable to justify the population deviations from ideal district population size in issue. 526 P.2d at 878–79. Likewise, any distinctions between Anchorage and South Anchorage are too insignificant to constitute a basis for invalidating the state's plan as unreasonable or arbitrary.

18. Kenai argues that the Board unnecessarily followed the superior court's order to make the fewest changes possible in its redistricting plan and thus failed to consider other available alternatives. The record shows that the Board did

consciously abide by this constraint, and thus suggests that other alternatives may have been available if all of Alaska were reapportioned. At issue here, however, is the validity of the districts which the Board actually created, not the districts which were possible or preferable.

We also note that sheer practicality may provide a justification for attempting to resolve population imbalance within a problematic area of relatively high population rather than outside it. As noted above, in *Groh* we upheld a district in the Aleutian Chain because of the imbalance which would have increased in the rest of the state had the district been drawn to include population from outside that area. 526 P.2d at 879–80. Here, an alternative configuration of districts for Alaska as a whole might well have caused greater population imbalances in rural parts of the state and heightened the difficulty of maintaining the constitutionally required compactness of the Kenai area.

In *Wade v. Nolan,* 414 P.2d 689, 700 (Alaska 1966), we upheld the authority of the governor to reapportion senate districts despite the absence of express authority for such reapportionment in the constitution. After discussing the possibility that the framers intended to freeze the apportionment of senate districts and the invalidity of "frozen" area apportionment plans under federal law, we stated:

> Unanticipated changes in the law of the land have invalidated the Senate apportionment and now require that the Senate be expeditiously reapportioned on a population basis.... The Governor and the Reapportionment Board have reapportioned the Senate in the same manner that the constitution requires them to reapportion the House.
>
> An enlightened construction of Article VI which permits realization of its fundamental purpose, that reapportionment not be dependent in any manner on legislative initiative and that effective means of enforcement be readily available to any voter, is that its remaining constitutional provisions provide the implied power in the Governor and the Reapportionment Board to reapportion the Senate on an interim basis and we so hold.

414 P.2d at 700. In *Wade* we did not reach the question of the applicability of article VI, section 6 to senate redistricting. We subsequently noted that the constitution has never been amended in this regard and that the governor's implied power to reapportion senate districts therefore remains in force under *Wade. Egan,* 502 P.2d at 874.[19]

*Wade* does suggest the approach to be taken when, as here, circumstances require

this court to decide an issue not explicitly considered by the framers themselves:

> The facts before us were not anticipated by the Convention. It is appropriate, therefore, that we attempt to determine from Article VI as a whole and appropriate Convention Minutes, what was the pervading purpose and intent of the Convention. We must then determine whether a fair interpretation of the various provisions of Article VI will° support a construction which permits accomplishment of this purpose, bearing in mind that often "* * * what is implied is as much a part of the instrument as what is expressed."

414 P.2d at 698 (quoting *Ex parte Yarbrough,* 110 U.S. 651, 658, 4 S.Ct. 152, 155, 28 L.Ed. 274, 276 (1884)).

Regarding the issue at bar, the minutes of the Constitutional Convention indicate that the creation of the senate districts reflected a compromise between rural and urban interests. Representatives of urban areas sought at-large representation by population while those speaking for rural areas sought smaller districts determined by geographic area. *See* 3 Proceedings of the Alaska Constitutional Convention 1876 (January 12, 1956) (Statement of Delegate John Hellenthal) ("The Committee has not ignored the principle of representation at large.... [But] the Committee [also] felt strongly that emphasis should be placed on giving representation in both the house and the senate to a degree to representatives from nonurban areas"); *see also id.* at 1881–82 (Statement of Delegate Frank Peratrovich). To protect the interests of the less populous rural areas, the framers amended the proposed constitution to pro-

---

**19.** In *Egan,* we held the 1971 apportionment plan unconstitutional and decided to appoint a master to formulate an interim reapportionment plan. 502 P.2d at 875. Our instructions to the master stated in part:

> In establishing House and Senate districts you should, wherever feasible, create a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.

*Id.* at 877. This instruction indicates that, at least in the case of a court-ordered interim reapportionment plan, article VI, section 6 requirements apply to senate districts. However, this standard does not necessarily circumscribe

the governor's power to effect a reapportionment of the senate because of the greater discretion he exercises in carrying out his duties. *Compare Hammond v. Carpenter,* Order S–451 (Alaska, May 25, 1984) (invalidating superior court's order to the Board to make the fewest possible changes in modifying the reapportionment plan because it restricted "the Governor's discretion in a way inconsistent with the Constitution and *Groh v. Egan* ") *with Egan,* 502 P.2d at 877 (instructing master "to make the districts correspond, where feasible, with the approximate boundaries in the 1971 reapportionment plan.").

vide that the boundaries of the senate districts would be respected if the districts were modified.[20] As the following exchange between delegates demonstrates, geography and rural representation, not socio-economic integration, was of paramount concern:

HARRIS: ... [T]he idea of the whole compromise from the beginning was that one [branch of the legislature] would be based on a geographic standpoint and the other one on a population standpoint, and the rural areas went along with it with that in mind, that they would be guaranteed representation.... [A] lot of other people from the rural areas ... said, "We may lose our house representatives, it is very possible, but we will never lose our senator." [T]his amendment ... is a compromise. It is a guarantee to the rural areas that they will always have representation....

....

HELLENTHAL: ... [T]o clear up any doubts that the senate was to be based strictly on area and the house strictly on population, ... let me read from the report of the Committee: *"In the composition of the senate, stress was placed upon area with minor stress upon socio-economic groups."* It did develop, though, that there was a conflict in the Committee.... This amendment ... is crystal clear. *The senate of Alaska, and*

*the constitution is now based strictly, 100 per cent upon area, but the great objective of this group has been secured in that the minor areas are assured of representation.* That was what we set out to accomplish, that the minor areas in Alaska, *the small hinterland, would be assured of representation, and it wouldn't all go to the cities.*

5 Proceedings of the Alaska Constitutional Convention 3468–69 (January 28, 1956) (emphasis added).

We conclude that the framers aimed to ensure that rural communities retained senate representation by using geographic area as a criterion for establishing senate districts and did not contemplate socio-economic integration as a criterion for redistricting senate seats. Therefore, we hold that the provisions of article VI, section 6 which set forth socio-economic integration, compactness and contiguity requirements are inapplicable to redistricting and reapportionment of senate districts.[21]

## V. DOES SENATE DISTRICT E VIOLATE THE EQUAL PROTECTION CLAUSE OF EITHER THE UNITED STATES OR ALASKA CONSTITUTION?

### A. *The Federal Equal Protection Clause.*

Appellant Jim Crawford argues that a reapportionment may be invalid under our

---

**20.** Alaska Const. art. VI, § 7 provides in relevant part:

The senate districts ... may be modified to reflect changes in [house] election districts. A district, although modified, shall retain its total number of senators and its approximate perimeter.

**21.** We decline to sever the compactness and contiguity requirements from article VI, section 6 and to find them applicable to senate districts, although as will be discussed *infra* part V B, senate districts which meander and ignore political subdivision boundaries and communities of interest will be suspect under the Alaska equal protection clause. Even if article VI, section 6 did apply to senate districts, we would uphold Senate District E under its requirements.

The dispute over Senate District E turns on the question of whether House Districts 6 and 7 should be separated from House District 16, resulting in two separate senate districts. It is clear that the governor has the power to create

either single or multi-member districts, *see Egan,* 502 P.2d at 873, and although article VI, section 6 requires districts to be composed of contiguous and compact territory, it "calls only for relative compactness." *Carpenter,* 667 P.2d at 1218 (Matthews, J., concurring). Separating any multi-member district would create more compact districts, but requiring the governor to use single-member districts would infringe on his authority. In this regard we note that the United States Supreme Court has mandated the use of single-member districts only when redistricting has been done by a court. *Compare City of Mobile v. Bolden,* 446 U.S. 55, 60, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47, 57 (1980) (multimember legislative districts are not unconstitutional per se) *with Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465, 474 (1977) ("[S]ingle member districts are to be preferred in court-ordered legislative reapportionment plans unless the court can articulate a 'singular combination of unique factors' that justifies a different result.").

decision in *Groh* if it is improperly motivated or has an impermissible effect. *See* 526 P.2d at 877. Crawford argues that Senate District E resulted from improper motivation because the reapportionment plan as a whole was specifically directed against members of the Republican party. He urges this court to implement his proposed remedy of creating a two-member senate district composed of House Districts 5, 6, and 7, and a single-member senate district for House District 16.

Kenai also argues that the Board had impermissible motives in designing Senate District E, contending that the Board included South Anchorage within the district in order to produce a rural constituency and to dilute the political power of Anchorage voters.[22] Kenai asserts that such a dissipation of voting strength is invalid because it disfavors voters from a particular geographic area.

■ In the context of voting rights in redistricting and reapportionment litigation, there are two basic principles of equal protection, namely that of "one person, one vote"—the right to an equally weighted vote—and of "fair and effective representation"—the right to group effectiveness or an equally powerful vote. *See* Note, *The Constitutional Imperative of Proportional Representation*, 94 Yale L.J. 163, 163–64 (1984); *Davis v. Bandemer*, —— U.S. ——, ——, 106 S.Ct. 2797, 2828, 92 L.Ed.2d 85, 127–28 (1986) (Powell, J., dissenting); L. Tribe, American Constitutional Law §§ 13–2, 13–3, and 13–7 (1978); *infra* text accompanying notes 27–32. We will consider Senate District E with respect to each of these principles in turn.

1. *One Person, One Vote.*

■ Under a "one person, one vote" theory, "minor deviations from mathematical equality among state legislative dis-

tricts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney v. Cummings*, 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298, 307 (1973). As noted above, as a general matter an apportionment plan containing a maximum population deviation under 10% falls within this category of minor deviations. *Brown v. Thomson*, 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214, 222 (1983). The state must provide justification for any greater deviation.[23]

Although seeking to attain a balance between rural and urban power will not justify denying voters an equally weighted vote, *Davis v. Mann*, 377 U.S. 678, 692, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609, 618 (1964), the record in the instant case contains no suggestion that Senate District E denies either Republicans or voters of urban Anchorage their right to an equally weighted vote.

Kenai relies on Justice Brennan's concurrence in *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320, *modified*, 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973), in suggesting that the mere motive of favoring one geographic area over another in terms of voting effectiveness violates the equal protection clause. In his opinion Justice Brennan agreed with the majority that the apportionment process must be "free from any taint of arbitrariness or discrimination" and concluded that the lower court's finding that the apportionment in issue included a "built-in bias" tending to favor a particular area required invalidation of the apportionment without regard to the state's purported justification for the districts. *Id.* at 344, 93 S.Ct. at 995, 35 L.Ed.2d at 341–42. However, the plan which he found arbitrary *resulted* in "per-

---

**22.** The challenger to a multi-member district carries the burden of proving that the district unconstitutionally operates to dilute or cancel the voting strength of racial or political elements. *Whitcomb v. Chavis*, 403 U.S. 124, 144, 91 S.Ct. 1858, 1869, 29 L.Ed.2d 363, 376 (1971).

**23.** The Supreme Court has expressly identified a state's desire "to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme" as a legitimate justification for such deviations. *Reynolds*, 377 U.S. at 578, 84 S.Ct. at 1390, 12 L.Ed.2d at 537.

vasive underrepresentation."[24] Thus, even under Justice Brennan's view, the impermissible "built-in bias" was one which actually denied voters of an area an equally weighted vote.[25]

Here, without the excessive deviation caused by the Southeastern districts, the reapportionment plan would be prima facie constitutional.[26] To sustain a claim of political discrimination against Republicans or urban Anchorage voters merely because of "impermissible" motives would be inconsistent with the quantitative, "one person, one vote" prong of equal protection in the context of legislative reapportionment. For appellants to prevail on such a claim, they must prove a qualitative violation— that is, a denial of "fair and effective representation."

### 2. *Fair and Effective Representation.*

 That the equal protection clause protects the rights of voters to an equally meaningful vote has been inferred from *Reynolds* in which the Supreme Court said

that "the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment."[27] 377 U.S. at 565–66, 84 S.Ct. at 1383, 12 L.Ed.2d at 529. While the *Reynolds* court stated that "the overriding objective [of apportionment] must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State," *id.* at 579, 84 S.Ct. at 1390, 12 L.Ed.2d at 537, it subsequently acknowledged that multimember districts "may be vulnerable, if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized."[28] *Gaffney v. Cummings*, 412 U.S. at 754, 93 S.Ct. at 2332, 37 L.Ed.2d at 312 (1973). Redistricting intended to achieve "a rough approximation" of the strengths of political groups in state legislatures, rather than fencing out such groups, is permissible. *Id.* at 752, 754, 93 S.Ct. at 2331, 2332, 37 L.Ed.2d at 311, 313.[29]

**24.** In the geographic area which Justice Brennan considered to be discriminated against, each house seat was underrepresented by an average of 4.3% and several were underrepresented by as much as 6.3%. 410 U.S. at 344, 93 S.Ct. at 995, 35 L.Ed.2d at 342.

**25.** We note that one state court held that where only the population deviation of a single geographic area—two adjacent districts—exceeded the 10% threshold, the remainder of the reapportionment plan was prima facie valid absent a showing of bad-faith actions. *Holmes v. Farmer*, 475 A.2d 976, 987, 988 (R.I.1984). In *Holmes* these two districts rendered Rhode Island's reapportionment plan invalid due to an overall deviation of 11.5%; without them the total deviation of the entire plan would have been 5.4%, and thus prima facie constitutional. *Id.* The court upheld the plan, finding no need to invalidate it in its entirety to correct the disparity caused by the two districts, but enjoined its implementation with respect to those districts. *Id.* at 988.

**26.** The total variance for senate districts outside Southeastern Alaska is 6.4%.

**27.** *See* L. Tribe, *supra* § 13–7, at 749 (1978); D. Lowensteen and J. Steinberg, *The Quest for Legislative Districting in the Public Interest: Elusive or Illusory?*, 33 U.C.L.A.L.Rev. 1, 9–11 (1985).

**28.** The drawing of district boundaries or creating of multi-member districts in order to dilute

the voting strength of a cognizable group of voters is generally referred to as gerrymandering. Gerrymandering is "the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes." *Davis v. Bandemer*, —— U.S. ——, ——, 106 S.Ct. 2797, 2827, 92 L.Ed.2d 85, 125–26 (1986) (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 538, 89 S.Ct. 1225, 1232, 22 L.Ed. 519 (1969) (Fortas, J., concurring)). "The term 'gerrymandering,' however, is also used loosely to describe the common practice of the party in power to choose the redistricting plan that gives it an advantage at the polls." *Id.* —— U.S. at ——, 106 S.Ct. at 2827, 92 L.Ed.2d at 126. *See also* Note, *Constitutional Challenges to Gerrymanders*, 45 Chi.L.Rev. 845, 845–46 (1978).

**29.** *Gaffney* involved a challenge to redistricting for the Connecticut legislature in which the redistricting board "consciously and overtly adopted and followed a policy of 'political fairness,' which aimed at a rough scheme of proportional representation of the two major political parties." *Id.* 412 U.S. at 738, 93 S.Ct. at 2323–24, 37 L.Ed.2d at 303. The complainant alleged gerrymandering and "a built-in bias in favor of the Republican Party." *Id.* at 739, 93 S.Ct. at 2324, 37 L.Ed.2d at 303–304. The lower court had found that the policy of "partisan political structuring cannot be approved as a legitimate reason for violating the requirement of numerical equality of population in districting," *id.* at 740, 93 S.Ct. at 2324, 37 L.Ed.2d at 304, but the

Employing a multi-member district to achieve "a rough sort of proportional representation" for rural areas in the legislature would thus be permissible under the equal protection clause in light of *Gaffney.* If, however, the creation of such a district instead was purposefully used to exclude a certain group from political participation, it is more suspect.[30]

In *Bandemer,* the Supreme Court addressed a claim that Indiana's 1981 legislative apportionment plan unconstitutionally diluted the votes of Indiana Democrats.[31] The *Bandemer* Court rejected the claim, with a plurality of four justices taking the position that "plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." — U.S. at ——, 106 S.Ct. at 2808, 92 L.Ed.2d at 102. The plurality explained in part:

> In cases involving individual multi-member districts, we have required a substantially greater showing of adverse effects than a mere lack of proportional representation to support a finding of unconstitutional vote dilution. *Only where there is evidence that excluded groups have "less opportunity to participate in the political processes and to elect candidates of their choice" have we refused to approve the use of multi-member districts.* In these cases, we have also noted the lack of responsiveness by those elected to the concerns of the relevant groups.

> . . . .

> As with individual districts, where unconstitutional vote dilution is alleged in the form of statewide political gerrymandering, the mere lack of proportional representation will not be sufficient to prove unconstitutional discrimination. Again, without specific supporting evidence, a court cannot presume in such a case that those who are elected will disregard the disproportionately underrepresented group. Rather, *unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole.*

> Although this is a somewhat different formulation than we have previously used in describing unconstitutional vote dilution in an individual district, the focus of both of these inquiries is essentially the same. In both contexts, the question is whether a particular group has been unconstitutionally denied its chance to effectively influence the political process. In a challenge to an individual district, this inquiry focuses on the opportunity of members of the group to

Supreme Court, while recognizing that an equal protection claim may be made out even where districts were "equal or substantially equal in population," concluded:

> [N]either we nor the district courts have a constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State.

*Id.* at 751, 754, 93 S.Ct. at 2332, 37 L.Ed.2d at 311, 313.

**30.** In cases where the excluded group is a racial minority, such gerrymandering would be unconstitutional. *Compare Rogers v. Lodge,* 458 U.S. 613, 617–20, 102 S.Ct. 3272, 3275–77, 73 L.Ed.2d 1012, 1017–20 (1982), *with United Jewish Orgs.,* 430 U.S. at 167–68, 97 S.Ct. at 1010–11, 51 L.Ed.2d at 247.

**31.** *Bandemer* involved the following facts. In 1981, the governor of Indiana was a member of the Republican Party, which controlled both houses of the Indiana General Assembly. Pursuant to the state constitution, the General Assembly undertook legislative redistricting based on 1980 census data, and the task of drawing district maps was assigned to a legislative committee composed solely of Republicans. The committee conducted the redistricting process in secret; no Democratic legislators participated in designing the district maps; no hearings were held to invite public comment; and the data fed to the computer utilized in the process concerned the political complexion of Indiana's precincts. The Republican committee revealed its proposed redistricting plan two days before the end of the legislative session, and the Democrats hurriedly presented an alternative plan. On the last day, the Republican plan was passed by a party line vote in both houses of the General Assembly, and the governor signed it into law. — U.S. at ——, 106 S.Ct. at 2826, 92 L.Ed.2d at 125.

participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate. *Statewide,* however, *the inquiry centers on the voters' direct or indirect influence on the elections of the state legislature as a whole.* And, as in individual district cases, *an equal protection violation may be found only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context, such a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process.*

*Id.* at ——, 106 S.Ct. at 2810, 92 L.Ed.2d at 104–06 (emphasis added and citations omitted). Thus, under the plurality's view, a showing of purposeful disproportionality alone can not support a challenge to a legislative apportionment plan; a consistent degradation of a minority's voting power must be demonstrated. Moreover, "[r]elying on a single election to prove unconstitutional discrimination" does not satisfy this threshold condition in stating and proving a cause of action. *Id.* at ——, 106 S.Ct. at 2799, 92 L.Ed.2d at 107.

■ Both the "one person, one vote" and the "fair and effective representation" prongs of equal protection necessitate the use of "neutral and legitimate" criteria in redistricting. *Id.* at ——, 106 S.Ct. at 2828, 92 L.Ed.2d at 127–28 (Powell, J., dissenting). As observed by Justice Powell in his *Bandemer* dissent, "exclusive or primary reliance on 'one person, one vote' can betray the constitutional promise of fair and effective representation by enabling a leg-

islature to engage intentionally in clearly discriminatory gerrymandering." *Id.* at ——, 106 S.Ct. at 2829, 92 L.Ed.2d at 129. Justice Powell would test the constitutionality of an apportionment plan according to a number of neutral criteria,

[t]he most important of [which] ... are the shapes of voting districts and adherence to established political subdivision boundaries. Other relevant considerations include the nature of the legislative procedures by which the apportionment law was adopted and legislative history reflecting contemporaneous legislative goals. To make out a case of unconstitutional partisan gerrymandering, the plaintiff should be required to offer proof concerning these factors, which bear directly on the fairness of a redistricting plan, as well as evidence concerning population disparities and statistics tending to show vote dilution. No one factor should be dispositive.

*Id.* at ——, 106 S.Ct. at 2831–32, 92 L.Ed.2d at 131–32 (Powell, J., dissenting, citing with approval *Karcher v. Daggett,* 462 U.S. 725, 753–61, 103 S.Ct. 2653, 2671–75, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring)).[32]

■ In summation, proof of purposeful discrimination alone is insufficient to state a cause of action for political gerrymandering. The plurality in *Bandemer* would require additional proof that the group has been consistently and substantially excluded from the political process, denied political effectiveness over a period of more than one election, in order to raise a constitutional claim. With these principles in mind, we turn to the specific allegations made by Crawford and Kenai in this case.

We can summarily dispose of Crawford's claim that the Board's improper motivation in discriminating against the Republican Party renders the apportionment plan un-

---

**32.** Justice Powell suggests several indicators of constitutional bias in legislative redistricting. A legislative process which excludes one group and favors another is indicative of constitutional unfairness. *Bandemer,* at ——, 106 S.Ct. at 2832, 92 L.Ed.2d at 133 (Powell, J., dissenting). Indication of exclusion includes lack of public hearings and an exclusion of the minority group from working sessions. *Id.* District boundaries which meander and selectively ignore political subdivisions and communities of interest are also indicative of constitutional violation. *Id.* at ——, 106 S.Ct. at 2833, 92 L.Ed.2d at 134. Evidence of solely partisan motivation is likewise indicative. *Id.* at ——, 106 S.Ct. at 2834, 92 L.Ed.2d at 134–35.

constitutional. Crawford conceded in his reply brief that

> [r]eferences to identifiable political groups, and any adverse impact on any group's ability to effectively participate in the political process, are references to a gerrymandering claim, which is not involved in this case.

In light of the constitutional doctrine just outlined, Crawford obviously has not stated a claim for violation of the equal protection clause of the Federal Constitution.[33]

■■■ In regard to Kenai's claim of impermissible discrimination against Anchorage voters, we find that Kenai has not made the requisite demonstration under *Bandemer* that the Board attempted to consistently and substantially deny them representation. Although the Board did seek to prevent another "Anchorage" senate seat, proportionality was the Board's expressed goal in redistricting: the suggested purpose for the creation of Senate District E was to insure that "there would be a far better balance of interests" in the legislature. Moreover, at least eleven of the twenty state senators represent urban areas, and of these, eight are from Anchorage. If senate representation were mathematically proportional to population, Anchorage would be entitled to 8.51 senators.[34] Anchorage has a population as calculated for apportionment purposes of 42.6% of the state's total population and has received 40% of the state's senate seats; given an additional senator, for a total of nine, it would then have 42.6% of the population and 45% of the senate seats. (Kenai itself argues that the facts show another Anchorage seat would not be created by severing Senate District E into two districts.) We think the effect of this disproportionality is de minimus in a traditional system of winner-take-all representation.

Therefore, we hold that Senate District E does not violate the equal protection clause of the Federal Constitution.

B. *The Alaska Equal Protection Clause.*

We have explained the equal protection analysis that we apply under the Alaska Constitution in *Alaska Pacific Assurance Co. v. Brown,* 687 P.2d 264 (Alaska 1984). There we said:

> Alaska's own equal protection analysis was engendered in *Isakson v. Rickey,* 550 P.2d 359 (Alaska 1976), and *State v. Erickson,* 574 P.2d 1 (Alaska 1978). *Erickson* articulated an adjustable "uniform-balancing" test which placed a greater or lesser burden on the state to justify a classification depending on the importance of the individual right involved. *Id.* at 12. In effect, *Erickson* created a continuum of available levels of

**33.** Crawford goes on to suggest that this court should establish a new standard for reapportioning the state that would invalidate districts upon proof of either an improper motive or an impermissible effect. The problem with this suggestion is that it bifurcates the federal standard into a claim of discriminatory intent and a claim of discriminatory effect. Discriminatory intent alone is non-justiciable because no harm has occurred and therefore no viable claim for relief exists. *Cf. Greater Anchorage Borough v. City of Anchorage,* 504 P.2d 1027, 1035 (Alaska 1972) (no justiciable issue exists absent an "actual controversy"). If we were to rely on discriminatory effect alone, we would be establishing a proportional representation standard and also effectively selecting which of alternative reapportionment plans seems preferable, rather than determining whether the challenged plan is reasonable, and thereby be encroaching on the governor's reapportionment power. *See Groh,* 526 P.2d at 866. We thus will require a showing of proportionality only after intentional discrimination has been proven. We note that article VI, section 6 alone identifies the criteria governing reapportionment; if the framers had intended to make proportionality a criterion for the establishment of new districts, they presumably would have included it in this section or written a sister provision.

**34.** We take judicial notice of the fact that the 1980 census population of the Municipality of Anchorage was 174,431. Alaska R.Evid. 201. Reducing this figure by the number of non-resident military personnel and dependents results in a Municipality of Anchorage population for apportionment purposes 156,787.20 (174,431—17,683.80). Thus, if representation were proportional Anchorage would be entitled to 8.51 senators (rounded to the nearest hundredth decimal place). Put another way, Anchorage would be entitled to 42.6% of the state senate seats (rounding off to the nearest tenth of a percent).

$$\frac{\text{X Senators}}{\text{20 Senators}} = \text{or} \ \frac{156,787.20}{368,420.29} = \frac{\text{Anchorage Population}}{\text{State Population}}$$

scrutiny, beginning with the rational basis test described in *Isakson*, 550 P.2d at 362–63, and ending with the functional equivalent of the federal compelling state interest test at the highest level of review.

In *Erickson* we looked first to the legitimacy of the state purposes behind challenged legislation, second to the relationship between the chosen means and the asserted goals of the statute, and third to the state's interest in the means chosen as balanced against the nature of the constitutional right infringed. 574 P.2d at 12. Our recent opinion in *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983), formally revised the order of the analytic stages of *Erickson*. First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment. The nature of this interest is the most important variable in fixing the appropriate level of review. Thus, the initial inquiry under article I, section 1 of Alaska's constitution goes to the level of scrutiny. *Ostrosky*, 667 P.2d at 1192–93 & n. 14. Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.

Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.

Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale we have held that a substantial

relationship between means and ends is constitutionally adequate. At the higher end of the scale, the fit between means and ends must be much closer. If the purpose can be accomplished by a less restrictive alternative, the classification will be invalidated.

*Id.* at 269–70 (footnote omitted).

On several occasions we have further explained that where there is no fundamental right at stake, the equal protection clause of the Alaska Constitution imposes a stricter standard than its federal counterpart.[35] While the applicable federal equal protection standard in reapportionment cases has not been clearly established, *see* L. Tribe, *supra* § 13–6 at 748, we will continue to use our stricter equal protection standard when assessing the constitutionality of a reapportionment plan. Because we conclude that the effect of the Board's intentional geographic discrimination in creating Senate District E tends toward disproportionality of representation and its purpose is therefore illegitimate, we hold the district unconstitutional under the equal protection clause of the Alaska Constitution.

### 1. *Weight of Constitutional Interest Impaired.*

While it is clear that the right to vote is fundamental, *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982), the constitutional interest allegedly impaired here is not the right to vote per se, but the interest of individual members of a geographic group or community in having their votes protected from disproportionate dilution by the votes of another geographic group or community. That is, the interest asserted is the right to an equally powerful and geographically effective vote in the state legislature. In this connection we note that it is implicit in our constitutional structure that similarly situated communities be treated

---

**35.** *See, e.g., Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1267 (Alaska 1980) ("[E]qual protection, even under Alaska's stricter standard ..."); *State v. Erickson*, 574 P.2d 1, 11 (Alaska 1978) (reaffirming that the test under the Alaska equal protection clause at the lower, non-fundamental right level requires a more exacting scrutiny); *Isakson v. Rickey*, 550 P.2d 359, 362–63 (Alaska 1976) (A more flexible and demanding standard will be applied; facts will no longer be hypothesized as was the case under the traditional rational basis standard.).

in a similar manner. *See, e.g.*, Alaska Const. art. II, § 19 (prohibiting local or special acts if a general act can be made applicable); *Abrams v. State*, 534 P.2d 91, 94 (Alaska 1975) (act is local or special if not reasonably related to a matter of common interest to the whole state). We consider a voter's right to an equally geographically effective or powerful vote, while not a fundamental right, to represent a significant constitutional interest.

### 2. *Purpose Served by the Board's Action.*

 Expressing its concern that a single-member senate district composed of House Districts 6 and 7 would result in the district's domination by the South Anchorage area and the creation of an additional Anchorage senate seat, the Board deliberately fashioned Senate District E to retain the balance between regional and Anchorage senate representation. The legitimacy of this purpose hinges on whether the Board intentionally sought to dilute the voting power of Anchorage voters disproportionately. Thus, if the Board sought to denigrate the voting power of Anchorage voters systematically by reducing their senate representation below their relative strength in the state's population, then such a purpose would be illegitimate.

We are of the view that a neutral factors test, similar to that proposed by Justice Powell in *Bandemer,* — U.S. at —, 106 S.Ct. at 2832, 92 L.Ed.2d at 131–32 (Powell, J., dissenting), should be employed to assess the legitimacy of the Board's purpose in designing Senate District E.[36] Under such a test we look both to the process followed by the Board in formulating its decision and to the substance of the Board's decision in order to ascertain whether the Board intentionally discriminated against a particular geographic area. Wholesale exclusion of any geographic area from the reapportionment process and the use of any secretive procedures suggest an illegitimate purpose. District boundaries which meander and selectively ignore political subdivisions and communi-

ties of interest, and evidence of regional partisanship are also suggestive. The presentation of evidence that indicates, when considered with the totality of the circumstances, that the Board acted intentionally to discriminate against the voters of a geographic area will serve to compel the Board to demonstrate that its acts aimed to effectuate proportional representation. That is, the Board will have the burden of proving that any intentional discrimination against voters of a particular area will lead to more proportional representation. Because our equal protection clause is more stringent than the federal equal protection clause, a showing of a consistent degradation of voting power in more than one election will not be required; rather once the Board's discriminatory intent is evident, its purpose in redistricting will be held illegitimate unless that redistricting effects a greater proportionality of representation. Moreover, because of our stricter constitutional standard, we will not consider any effect of disproportionality de minimus when determining the legitimacy of the Board's purpose.

A totality of the circumstances assessment of the Board's reapportionment process is unnecessary here because the Board's intent was discriminatory on its face. *Cf. Bandemer*, at —, 106 S.Ct. at 2833–35, 92 L.Ed.2d at 133–36. It is evident that the Board sought to prevent another Anchorage senate seat in the state legislature, and normally the Board would thus be required to demonstrate that this intentional discrimination resulted in increased proportionality of geographic representation in the state legislature. We will not remand this aspect of the case, however, since we are able to decide the issue based on the statistical evidence of disproportionality developed in the record below.

As noted above, Anchorage has a population for apportionment purposes of 42.6% of the state's total population and has received 40% of the state's senate seats; with an additional senate seat, it would have

---

**36.** *See also supra* note 32 and accompanying text.

approximately 45% of the senate seats.[37] Thus, Anchorage will either remain underrepresented by 2.6% or become overrepresented by 2.4%, depending on whether Anchorage voters can in fact win the additional seat. Put another way, strict proportionality would give Anchorage voters 8.51 senate seats, and a redistricting toward proportionality would allow them the potential to win a ninth senate seat.

Because it is clear that the Board intended to discriminate against the voters of Anchorage,[38] the Board has the burden of proving that it intentionally discriminated in order to increase the proportionality of geographic representation in the legislature. Since the record demonstrates that the action of the Board tends toward disproportionality—2.6% or .51 senate seat underrepresentation is more disproportionate than 2.4% or .49 senate seat overrepresentation—we conclude that the Board's purpose in creating Senate District E was illegitimate.[39] We therefore hold the district unconstitutional under the equal protection clause of the Alaska Constitution.[40]

Nevertheless, although we will not consider any effect of disproportionality de minimus in determining whether the Board's purpose is illegitimate, the degree of disproportionality will be considered in determining the appropriate relief to be granted. Here the effect of the Board's discriminatory intent is de minimus. Given this circumstance we conclude that a declaration that the Board's purpose in fashioning Senate District E was illegitimate under Alaska's equal protection clause is an adequate remedy, and we will not require the Board to redraw Senate District E. In contrast with federal apportionment decisions which have not held unconstitutional an insubstantial disadvantagement of groups of voters, e.g., Bandemer, at ——, 106 S.Ct. at 2810, 92 L.Ed.2d at 106, or a minor deviation from ideal district size, e.g., Brown, 462 U.S. at 842–43, 103 S.Ct. at 2695–96, 77 L.Ed.2d at 221–22, we are of the view that declaratory relief in this instance promotes scrupulous observance of the law and at the same time adheres to the principle that the relief fashioned remedies the actual injury.[41]

37. See supra note 34 and accompanying text.

38. We note the caution expressed by the Supreme Court in regard to such circumstances in *Abate v. Mundt*, 403 U.S. 182, 185–86, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399, 403 (1971) (citation omitted):
 [W]e have underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas or political interests or which necessarily will tend to favor, for example, less populous districts over their more highly populated neighbors.

39. Cf. *Gilman v. Martin*, 662 P.2d 120, 126–27 (Alaska 1983). Implicit in our holding is that the superior court's findings of fact to the effect that the 1984 plan was not the product of a discriminatory intent on the Board's part are clearly erroneous.

40. Our holding that the Board did not have a legitimate purpose in constructing Senate District E renders it unnecessary for us to address the issue of whether there is a substantial relationship between the Board's means and ends. However, we note that since intentional geographic discrimination in reapportionment is justifiable only if greater proportionality in geographic representation in the legislature will result therefrom, proof of a legitimate purpose will normally be synonymous with proof of a substantial relationship between the Board's means and ends. That is, proof of the purpose or "end" of increased proportionality of representation serves as proof that the reapportionment itself, the "means," achieved that desired end, and thus demonstrates the requisite substantial relationship. The last two parts of the test therefore merge.

41. Cf. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, —— n. 11, ——, 106 S.Ct. 2537, 2544 n. 11, 2545, 91 L.Ed.2d 249, 260 n. 11, 261 (1986) (holding compensatory damages based solely on the abstract value or importance of constitutional rights are not permissible; "nominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury"). In *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252, 266 (1978) (footnote omitted), the Court similarly indicated that a remedy should be fashioned to respond to actual injury:
 Common-law courts traditionally have vindicated deprivations of certain 'absolute' rights [such as rights to constitutional procedural due process] that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the

The judgment of the superior court is AFFIRMED in part, REVERSED in part.

MOORE, J., not participating.

COMPTON, J., dissents.

COMPTON, Justice, dissenting in part.

In interpreting Alaska's equal protection clause we expressly depart from the burdensome federal constitutional threshold test which requires both a showing of intentional discrimination against an identifiable group and a substantial discriminatory effect on that group. *See Davis v. Bandemer,* — U.S. —, —, 106 S.Ct. 2797, 2808, 92 L.Ed.2d 85, 102 (1986) (plurality). The test we set out under Alaska's equal protection clause also has two parts: 1) a showing of purposeful discrimination against voters of a geographic area; 2) without effectuating proportional representation. However, unlike the federal standard, "we will not consider any effect of disproportionality de minimus when determining the legitimacy of the Board's purpose." *Opinion* at 1372.

The extra protection afforded by Alaska's equal protection clause is, however, illusory. Although we are willing to "declare" Senate District E unconstitutional, we refuse to grant affirmative relief[1] because the effect of disproportionality is de minimus. Because relief is tied to a showing of more than a de minimus violation, Alaska's equal protection clause goes no further to protect Alaskan citizens than does the United States Constitution. If indeed the harm in this case is de minimus then we should have declined to reach the constitutional issue in the first place. *Cf. Wickwire v. City and Borough of Juneau,* 557 P.2d 783, 786 (Alaska 1976) (Boochever, J., dissenting). However, after having articulated the Alaska constitutional standard the court should not now be heard to say that it is not going to do anything about it.

The court reaches the incredible conclusion that a mere "declaration" of illegitimate purpose is an adequate remedy. Such a declaration is no remedy at all. The United States Supreme Court has stated: "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506, 541 (1964).[2] Merely opining that Sen-

---

law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

In another context, the Court has emphasized that the motivation of those who undertake an act will not in and of itself violate equal protection guarantees. In *Palmer v. Thompson,* 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438, 444 (1971), having found no discriminatory effect in a local government decision to surrender the lease of one city pool and close four others rather than operate them on a desegregated basis, the Court went on to note "no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *See also, Bandemer,* — U.S. at —, 106 S.Ct. at 2808, 92 L.Ed.2d at 102 ("plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group").

1. Crawford requests that the court create a two-member district composed of House Districts 5, 6 and 7 and a single member senate district for House District 16. Kenai requests a remand to the Board for further action.

2. The Court explained that a court may defer awarding relief, but retain jurisdiction, when an impending election is imminent or when the legislature undertakes to reapportion. 377 U.S. at 585, 84 S.Ct. at 1394, 12 L.Ed.2d at 541. Here, neither contingency is on the horizon. Moreover, because no affirmative relief has been granted to appellants, there is no need for any court to retain jurisdiction.

This court has adopted an analogous supervisory approach in the context of criminal constitutional rights. In *State v. Sundberg,* 611 P.2d 44 (Alaska 1980) we decided not to apply the exclusionary rule to an excessive force arrest because we noted that there are other deterrents and at that time there was no history of excessive force arrests. *Id.* at 52. However, this court specifically left open the option to reexamine the exclusionary sanction in future cases, not so with respect to reapportionment.

ate District E is unconstitutional is no guarantee that a reapportionment board will "scrupulously observe" the mandate of the Alaska constitution in the future. If there is no sanction for engaging in an unlawful process, a board can continue to do so risking only the inconvenience and expense of defending another declaratory suit. Accordingly, awarding only declaratory relief may encourage a board to cut corners when by so doing it can further illegal goals at little or no risk.

The court decides to withhold affirmative relief based on the principle that the relief fashioned should remedy the actual injury. *Opinion* at 1373. The court concludes that because the actual injury in this case is a de minimus discriminatory effect[3] of underrepresentation of .51 senate seats, the relief fashioned should be similarly inconsiderable.

The court relies upon cases brought under 42 U.S.C. § 1983, a "constitutional tort" provision,[4] to support the proposition that in the instant case declaratory relief remedies the actual injury. However, section 1983 cases are inapposite. Typically in a section 1983 action a plaintiff seeks to redress a violation of an intangible constitutional right which has resulted in measurable harm. For example, in *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) a school teacher who was wrongfully dismissed proved certain compensatory damages such as out of pocket loss, damage to reputation, personal humiliation and mental anguish. 477 U.S. at ——, 106 S.Ct. at 2541–42, 91 L.Ed.2d at 256–58 (citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (mental and emotional distress constitute compensable

injury in a section 1983 claim)). In contrast, the constitutional right here violated, the right to an equally powerful and geographically effective vote in the state legislature, does not need to be, and indeed cannot be, reduced to a monetary figure to grant relief. The court has been asked to exercise its broad equitable powers because the remedy at law (damages) is inadequate. Consequently, this court's reliance on tort cases is misplaced.

Similarly misguided is the court's reliance upon cases which stand for the proposition that the motivation of those who undertake an act does not in and of itself violate equal protection guarantees. *See Opinion* at 1373 n. 41 (citing *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *Bandemer,* —— U.S. at ——, 106 S.Ct. at 2808, 92 L.Ed.2d at 102). The court today expressly rejects the two part federal analysis in formulating Alaska's equal protection standard. We state "once the Board's discriminatory intent is evident, its purpose in redistricting will be held illegitimate unless the redistricting effects a greater proportionality of representation." *Opinion* at 1372. Thus, improper motive with no redeeming purpose is enough to violate Alaska's equal protection guarantees. Therefore, it is illogical to embrace the more demanding federal analysis to justify denial of affirmative relief under the Alaska standard.

---

**3.** I disagree that the discriminatory effect is de minimus. As a result of this Board's plan Anchorage may have been denied one senate seat. Moreover, by refusing to order the Board to redraw Senate District E, Anchorage voters will remain underrepresented in elections to be held before the next reapportionment process. Since the next federal census is in 1990, elections in 1988 and possibly 1992 will be held under an illegal plan. Alaska Const. art. VI §§ 3, 10 (following each decennial census a board shall submit to the governor a plan for reapportionment).

**4.** *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, ——, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249, 258 (1986) observes that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of constitutional rights. Accordingly, when § 1983 plaintiffs seek damages, the level of damages is ordinarily determined according to principles derived from the common law of torts.